# United States Court of Appeals
## For the First Circuit

---

No. 00-2324

LISA GELABERT-LADENHEIM,

Plaintiff, Appellant,

v.

AMERICAN AIRLINES, INC.,

Defendant, Appellee.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Hector M. Laffitte, U.S. District Judge]

---

Before

Selya, Circuit Judge,
Coffin, Senior Circuit Judge,
and Lynch, Circuit Judge.

---

Raymond L. Sanchez Maceira, with whom Melba Rivera Camacho was on brief, for appellant.

John F. Suhre, with whom Gwendolyn Young Reams, Associate General Counsel, Philip B. Sklover, Associate General Counsel, and Vincent J. Blackwood, Assistant General Counsel, were on brief, for Equal Employment Opportunity Commission, amicus curiae.

Angel Castillo, Jr., with whom Kara S. Nickel and Morgan, Lewis, & Bockius LLP were on brief, for appellee.

June 12. 2001

**LYNCH, Circuit Judge**.  Unlike other areas of discrimination law where the protected status of the plaintiff (e.g., race or gender) is usually not at issue, the law of disability discrimination often presents a threshold question of whether a plaintiff is in fact disabled.  This question frequently arises when the plaintiff is suffering from carpal tunnel syndrome ("CTS"), an affliction that can result from repetitive motion injury.  Under the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 et seq., the term "disability" has a specialized meaning, more restrictive at times than the meaning in the common use of the term "disabled."  Under the ADA a person must not only have a disability in the sense of a physical or mental "impairment," but, importantly, that impairment must also "substantially limit" a "major life activity."  42 U.S.C. § 12102(2)(A).  The CTS cases often turn on these last two prongs, and the results vary with the individualized facts of a given case.  That is particularly so when the "major life activity" claimed to be impaired is that of "working."

The district court here entered summary judgment against plaintiff Lisa Gelabert-Ladenheim's ADA employment claim, concluding that because defendant American Airlines reasonably accommodated her alleged disability, namely, CTS, it did not violate the Act.  See Gelabert-Ladenheim v. American Airlines, Inc., 115 F. Supp. 2d 225 (D.P.R. 2000).  We affirm on the different ground that the plaintiff

has not produced sufficient evidence on summary judgment that her impairment substantially limits a major life activity, and so she does not meet the specialized definition of the term "disabled."

## I.

Plaintiff Lisa Gelabert-Ladenheim has a B.S. degree in Mass Communication from Emerson College in Boston, Massachusetts. She is fully bilingual in English and Spanish. Gelabert can type and operate a computer and various software programs. By her own admission she is qualified for positions in the fields of advertising, public relations, radio and television production, news writing and editing, and English-Spanish translation. Her past work experience is broad and includes jobs working in retail sales, narrating a documentary, doing a voice-over for a Spanish language commercial, and translating wire-copy.

In 1986, Gelabert began working as a passenger services agent for American Airlines at the Luis Muñoz Marín International Airport in San Juan, Puerto Rico. Gelabert worked as a gate agent for most of her career with American, after starting at the ticket counter. As a gate agent, Gelabert was required to use computers, prepare itineraries, compute fares, prepare and issue tickets, check baggage, and assist passengers who are elderly, traveling with small children, or in wheelchairs. Gelabert was also required periodically to update her training in ticketing.

4

Gelabert always worked part-time for American (twenty hours a week). Throughout her employment there, and afterwards, until four months after she had started a full-time job at the Wyndham El San Juan Hotel and Casino, Gelabert also worked another part-time job as a production coordinator and administrative assistant for a concert production company called Rocktropic.

In May 1993, Gelabert injured her left hand while on duty at American. She took a ten-month medical leave of absence; during her treatment she was diagnosed with CTS in both hands, worse in her left hand. By June 1994, Gelabert had received the maximum benefit from insurance treatment, and in August 1994, she was released from her insurance treatment with a declared 5% incapacity in her left wrist. Gelabert continued to receive treatment from a private physician. The condition deteriorated and now imposes a permanent impairment of 20% on both hands.

In February 1994, Gelabert returned to work at American. American placed her on restricted duty and assigned her to a temporary part-time position at a curbside station for American Eagle Airlines, Inc., its regional affiliate. This curbside position required Gelabert to direct passenger traffic and provide information, but not to lift luggage. She maintained her status as an American employee as well as her previous salary.

After August 1994, American reviewed Gelabert's medical file

5

and adopted the permanent physical exertion restrictions proposed by Gelabert's treating physician. On March 17, 1995, American informed Gelabert of her permanent work restrictions: no lifting of more than thirty pounds; no pushing or pulling of more than twenty pounds; no sitting or standing longer than eight hours; and moderate repetitive typing of no more than one to two hours at a time, followed by a fifteen minute break. Because Gelabert was no longer eligible for a restricted duty assignment and because she could not perform all her previous duties as a gate agent, American placed Gelabert on unpaid medical leave and authorized job search assistance to try to find her an alternate position at American. Gelabert remained on unpaid medical leave from March 19, 1995 until April 16, 2000, when she exhausted her allotment of medical leave. Throughout, American has maintained that Gelabert is not disabled within the meaning of the ADA.

Gelabert's main contact during the American Airlines job search was María Ramos-Salgado, a human services representative in San Juan. Gelabert and Ramos spoke approximately once a week, though Gelabert always initiated the contact. Ramos advised Gelabert to apply for several available positions at the San Juan airport, including ramp customer service team leader, ramp support staff, cargo services coordinator, and operations customer service team leader. Gelabert did not apply for any of these positions because she did not feel she could perform the duties they required. Gelabert neither requested any type

6

of accommodation nor consulted with her physician before choosing not to apply.  Gelabert also insisted that any position be part-time to enable her to continue working her other part-time job at Rocktropic. In addition, Gelabert told Ramos she needed to remain in the San Juan area to be close to family members who had health problems. Gelabert eventually applied and interviewed for other positions at American.  In May 1995, Gelabert applied for a vacant light-duty position as a special services representative, but that position was given to another American employee who had baggage handling experience Gelabert lacked.[1] In February 1996, Gelabert applied for another vacant light-duty position as a platinum desk agent, but that position was given to another American employee who had more extensive and more recent ticketing experience than Gelabert.  In both instances, American believed Gelabert, though qualified, was not the most qualified person for the job.

In May 1996, American contacted Gelabert for an interview for a part-time, temporary position as a sales and service representative in reservations.  Gelabert was interviewed and was offered the job but declined, without exploring it, telling American that because the position involved heavy repetitive typing she could not perform its

---

[1]     Special services representatives cater to American's "very important person" and "very important traveler" customers, and the airline wanted a candidate who could accommodate all of these customers' needs without having to refer them to another part of the airport for additional services like baggage handling.

7

essential functions.  Gelabert says American never told her that all sales and service representatives received a fifteen minute break from typing every one to two hours -- a regimen that paralleled Gelabert's own work restrictions.  Ramos says Gelabert never asked whether American could have accommodated her by allowing her to take such breaks.  Had Gelabert asked, Ramos says, she would have been told about the fifteen minute breaks.  Indeed, other employees with CTS, and with restrictions similar to Gelabert's, worked as sales and service representatives at American at the time.

In July 1996, Gelabert accepted a position outside American as an administrative office manager at the Wyndham El San Juan Hotel and Casino ("the Hotel").  There Gelabert is responsible for assisting the president and managing director with the Hotel's day-to-day operation.  The position is full-time, and Gelabert currently earns approximately $51,000 per year.  Gelabert's highest salary at American was approximately $15,000 per year (albeit for part-time work).

Gelabert also continued to work part-time for Rocktropic for approximately four months after she had been hired by the Hotel. Gelabert's decision to leave Rocktropic was not related to her CTS, but rather was based on her desire for a "career change." Gelabert's CTS has never significantly interfered with her job at the Hotel, nor did it ever significantly interfere with her job at Rocktropic.

**II.**

8

On December 20, 1996, Gelabert filed a disability discrimination charge with the Equal Employment Opportunity Commission against American Airlines. On June 15, 1999, she commenced this action. On August 28, 2000, the district court granted American's motion for summary judgment. The court determined that there was a genuine issue of material fact as to whether Gelabert was disabled under the ADA. It cited the restrictions on Gelabert's ability to type for more than forty-five minutes, to grasp, to push, to pull, and to lift. See Gelabert-Ladenheim, 115 F. Supp. 2d at 230. The court concluded, however, that Gelabert's ADA claim nonetheless failed on summary judgment in that no reasonable jury could find that American had failed in its duty to reasonably accommodate any such disability. Id. at 232-33. Gelabert now appeals the district court's grant of summary judgment.[2]

### III.

The parties pose the case as presenting a number of issues relating to the question of reasonable accommodation,[3] but we need only

---

[2] The district court also dismissed Gelabert's claim for retaliation under the ADA as well as her claim under Puerto Rican law. See Gelabert-Ladenheim, 115 F. Supp. 2d at 233. Gelabert has not appealed the court's dismissal of the retaliation claim, and so any such appeal has been waived. The dismissal of Gelabert's pendant local law claim was proper. See 28 U.S.C. §_1367(c)(3); see also United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966); Figueroa-Ruiz v. Alegria, 896 F.2d 645, 650 (1st Cir. 1990).

[3] Gelabert argues that the district court erred in concluding as a matter of law that American reasonably accommodated

decide the initial question of disability.

We conclude that Gelabert is not disabled under the Act because, though physically impaired, she has not adduced sufficient evidence that she is substantially limited in any major life activity to create a material dispute of fact.  We do not reach (and, consequently, express no opinion on) any of the issues with respect to whether American provided her with a reasonable accommodation or the scope of the accommodation duty.

Review of the district court's grant of summary judgment is de novo.  See, e.g., Thomas v. Eastman Kodak Co., 183 F.3d 38, 47 (1st Cir. 1999), cert. denied, 528 U.S. 1161 (2000).

Gelabert must initially demonstrate that she has raised a material issue of fact that she has "a physical or mental impairment that substantially limits one or more of [her] major life activities." 42 U.S.C. § 12102(2)(A).  Her CTS constitutes a physical impairment. See Quint v. A.E. Staley Mfg. Co., 172 F.3d 1, 9 (1st Cir. 1999). Gelabert does not claim she is substantially limited in any major life

her disability.  She argues, inter alia, that absent an undue hardship, an employer must reassign an individual to a vacant position for which the individual is qualified when the individual, due to a disability, can no longer perform the essential functions of her present job even with reasonable accommodation.  The EEOC has submitted a brief as amicus curiae in support of Gelabert on this issue.  In response, American argues that the ADA does not require it to violate its legitimate, non-discriminatory policy of selecting the most qualified candidate for an available position, even if the disabled candidate is qualified to perform the essential functions of that position.

10

activity other than working.[4]

For present purposes, we accept arguendo that "working" is a major life activity.  See 29 C.F.R. § 1630.2(i); see also Lebron-Torres v. Whitehall Labs., __ F.3d __, No. 00-1724, 2001 WL 563801, at *3 (1st Cir. May 30, 2001); Quint, 172 F.3d at 10.  There is, however, "some conceptual difficulty in defining 'major life activities' to include work."  Sutton v. United Air Lines, Inc., 527 U.S. 471, 492 (1999).  The EEOC has itself suggested that working be viewed as a residual life activity, considered only as a last resort "[i]f an individual is not substantially limited with respect to any other major life activity."  29 C.F.R. pt. 1630, App. § 1630.2(j); see also Lessard v. Osram Sylvania, Inc., 175 F.3d 193, 197 (1st Cir. 1999) ("'Working' itself is a somewhat elastic term . . . .").  When the major life activity of working is at issue (as opposed to any other major life activity), the plaintiff "assumes a more fact-specific burden of proof."  Quint, 172 F.3d at 11.

Also, when the question of whether someone is disabled turns

---

[4]    There was evidence that Gelabert continues to carry out her daily activities and household chores, though not without some difficulty, such as problems vacuuming, cramps when using her hair dryer, and occasional pain when lifting a bottle of shampoo in the shower.  Gelabert also experiences brief and sporadic periods of pain about four times during the day and more prolonged periods of pain at night (up to an hour at a time); the pain at night is caused by the splint she has to wear when sleeping.  Here, such evidence must be viewed in the overall context of how her condition actually affects her ability to work.

11

on the plaintiff's ability to work, the very existence of the disability turns on factors beyond simply the physical characteristics of the plaintiff.  See Duncan v. Washington Metro. Area Transit Auth., 240 F.3d 1110, 1118 (D.C. Cir. 2001) (en banc) (Randolph, J., concurring).  So, arguably, different results could be reached with respect to plaintiffs who suffer from identical physical impairments but who, due to a variety of factors like the economic health or geographic location of an area, face dissimilar employment prospects. These factors may be difficult for employees and employers to predict, and so both may be left with uncertainty as to whether there is any disability and thus any duty to provide a reasonable accommodation. That lack of predictability is an unfortunate artifact of ADA law.[5]

The plaintiff must meet the fact-specific burden Quint describes in the context of the ADA's mandated "individualized inquiry."  Sutton, 527 U.S. at 483; see Stephenson v. United Airlines, Inc., No. 00-15386, 2001 U.S. App. LEXIS 11400, at *9 (9th Cir. May 30, 2001) ("The ADA mandates an individualized inquiry to determine whether

_____

[5] The statute and EEOC regulations set up another difficulty as well.  A person may be sufficiently restricted by a physical impairment from doing her job that many would think the employer should make reasonable accommodations to keep the plaintiff employed. Yet, if the impairment does not affect any major life activity other than working, and the impairment does not prevent the plaintiff from working in a class of jobs or broad range of jobs in various classes, then, under the regulations, the plaintiff does not meet the ADA definition of disability and the employer has no duty to accommodate. See, e.g., Lebron-Torres, 2001 WL 563801, at *4-*5 (citing 29 C.F.R. § 1630.2(j)(3)(i)).

12

an employee is disabled."); <u>Lawson</u> v. <u>CSX Transp., Inc.</u>, 245 F.3d 916, 926 (7th Cir. 2001) ("[W]hether a person is disabled under the ADA is an individualized inquiry based on the particular circumstances of each case."); <u>cf.</u> <u>PGA Tour, Inc.</u> v. <u>Martin</u>, 532 U.S. __, No. 00-24, 2001 WL 567717, at *13 (U.S. May 29, 2001) ("[A]n individualized inquiry must be made to determine whether a specific modification for a particular person's disability would be reasonable under the circumstances . . . ."). The issue of whether the plaintiff's impairment substantially limits the major life activity of working involves a multi-level analysis, starting with the skills of the plaintiff herself and moving to the nature of the jobs she was prevented from performing as well as those she was not. The "individualized inquiry" mandates first a focus on the characteristics of the plaintiff. The inquiry focuses on the plaintiff's education level, training, job skills, expertise, and knowledge. This, in turn, requires a review of the plaintiff's employment: the job plaintiff is restricted from doing and the plaintiff's work history. If there is post-impairment work history, as here, that is also relevant. If the plaintiff worked part-time for the employer while simultaneously working elsewhere, as here, that is relevant too. Here, the question is what plaintiff's past and/or present work experience tells us about her current skills and abilities in the workplace, as compared with "the average person having comparable training, skills and abilities." 29 C.F.R. §

13

1630.2(j)(3)(i).

The second focus is on jobs and the relevant job market: the job plaintiff held, the jobs closed to plaintiff, and the jobs open to plaintiff within the reasonably accessible geographic area (as to which defendants may also produce evidence). The individualized characteristics of the plaintiff are the bedrock on which this jobs analysis must take place. As to the jobs themselves, there is no requirement in the ADA that a person be totally disabled from working;[6] indeed, a person cannot be totally disabled because she must be otherwise qualified to work. <u>See</u> 42 U.S.C. § 12111(8) (defining "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires").[7] The requirement is only that the otherwise qualified plaintiff be "substantially limited" in the major life

_____

[6] <u>Cf.</u> 42 U.S.C. § 423(d)(1)(A) (defining "disability" under the Social Security Act as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment").

[7] As one commentator has noted:
> In defining who is disabled, a "Catch 22" aspect appears: plaintiffs first must show that they have some impairment that substantially limits a major life activity. But these same plaintiffs must also show they are not so disabled as to be unable to perform the job, which implies lack of impairment.

Henry H. Perritt, Jr., 1 <u>Americans with Disabilities Act Handbook</u> 80 (3d ed. 1997). We do not think this case fairly raises this problem.

14

activity of working. The EEOC regulations illuminate this analysis:

(1) "[t]he inability to perform a single, particular job" does not constitute the required substantial limitation, 29 C.F.R. § 1630.2(j)(3)(i);

(2) the plaintiff must show that she is significantly restricted in her ability to perform "a class of jobs" -- that is, the job from which she is disqualified by reason of her impairment and those which utilize similar knowledge, training, skills or abilities, id. § 1630.2(j)(3)(ii)(B); and/or

(3) the plaintiff must show that she is significantly restricted in her ability to perform "a broad range of jobs in various classes" -- that is, the job from which she is disqualified by reason of her impairment and those which do not utilize similar knowledge, training, skills or abilities, id. § 1630.2(j)(3)(ii)(C).

We will assume a plaintiff must show significant restriction as to either a class of jobs or a broad range of jobs in various classes.[8] Although the EEOC regulations are silent as to consideration of jobs that are actually available to plaintiff (as opposed only to those jobs that are unavailable), we believe this consideration to be implicit in the statute and the regulations. If there were any doubt

---

[8]   So we assume in Gelabert's favor that even if she is not significantly restricted as to a broad range of jobs in various classes, she can still show she is disabled if she is significantly restricted as to a class of jobs.

15

as to this question, the Supreme Court apparently resolved it in

Sutton: "If jobs utilizing an individual's skills (but perhaps not his

or her unique talents) are available, one is not precluded from a

substantial class of jobs. Similarly, if a host of different types of

jobs are available, one is not precluded from a broad range of jobs."

527 U.S. at 492.[9] Whether, on certain facts, these EEOC regulatory

definitions comport with congressional intent is a matter we need not

reach here.[10]

In showing disqualification from a class of jobs or broad

range of jobs in various classes it is often helpful, but far from

required, for plaintiffs to produce evidence from a vocational expert.

In some cases, it will be obvious that a particular impairment is so

severe as to qualify as an ADA disability.  EEOC v. Rockwell Int'l

Corp., 243 F.3d 1012, 1019-20 (7th Cir. 2001) (Wood, J., dissenting).

In other cases, reference to publicly available labor market

statistics, such as simple government job statistics, may suffice.  See

---

[9]    This language in Sutton seems to reject the position taken
by the EEOC in McKay v. Toyota Motor Mfg., U.S.A., 110 F.3d 369 (6th
Cir. 1997), that the sole focus must be on the jobs plaintiff could
not perform, rather than on the jobs plaintiff could perform.  See
id. at 372.  We think both are pertinent.

[10]    This case also does not raise the very different problem
of what would happen in the case of a plaintiff trained, for example,
as a doctor, who suffers from an impairment that precludes her from
practicing medicine but not from performing manual labor jobs
available to her.  See Duncan, 240 F.3d at 1120 (Tatel, J.,
concurring).

<u>Duncan</u>, 240 F.3d at 1117.[11]

Applying the framework established above, our view is that no reasonable jury could conclude that Gelabert was disabled.  Here, there is not even a colorable claim that Gelabert is disqualified from a broad range of jobs in various classes.  She is plainly qualified for a great variety of jobs, by her own admission.

We test Gelabert's claim that she is nonetheless disqualified from a class of jobs "as compared to the average person having comparable training, skills and abilities."  29 U.S.C. § 1630.2(j)(3)(i).  The average college-educated bilingual woman in the San Juan area with computer skills and experience in retail sales, the entertainment industry, the news industry, and the hospitality and transportation industries does not have limited job prospects.  Due to her impairment, plaintiff is unable to lift more than thirty pounds, push or pull more than twenty pounds, sit or stand longer than eight hours, or type more than one to two hours without a break.  Those facts do not, on the evidence presented, mean that she is significantly restricted in her ability to perform a class of jobs.  Indeed, <u>Sutton</u> itself held the plaintiffs were not disabled where poor eyesight prevented them from being commercial pilots because they still

_____

[11]    Such statistics are readily available on the Internet, at sites like <www.occustats.com>, which provides at low cost a number of different reports on job requirements in specific local labor markets.  <u>Duncan</u>, 240 F.3d at 1117 n.5.

17

qualified for other types of pilot positions. 527 U.S. at 492-93.[12]

Further, that Gelabert is now employed in the hospitality industry (at a higher salary), and that she continued to work part-time in the entertainment industry after going on medical leave from American and for several months after she started working at the Hotel, are at odds with her conclusory claim that she is substantially limited in her ability to work. See Lebron-Torres, 2001 WL 563801, at *3 (plaintiff started working nearly full-time at home as a hair stylist, a previous occupation, after leaving job at pharmaceutical manufacturing company because of back injury); Santiago-Clemente v. Executive Airlines, Inc., 213 F.3d 25, 32-33 (1st Cir. 2000) (flight attendant suffering from hearing loss successfully continued her employment at airline); Gutridge v. Clure, 153 F.3d 898, 901 (8th Cir. 1998) (computer service technician suffering from CTS unable to perform previous job that involved lifting and moving computers but was hired less than one month

_____

[12]     See also Murphy v. United Parcel Serv., 527 U.S. 516, 524-25 (1999) (plaintiff not disabled where he could not perform a mechanic position that required that he drive a commercial motor vehicle, but where he could still perform other types of mechanic positions); Webb v. Clyde L. Choate Mental Health and Dev. Ctr., 230 F.3d 991, 998-99 (7th Cir. 2000) (psychologist not disabled where his condition precluded him from working in specialized niche of psychology, but where he could still work as a psychologist generally); Santiago-Clemente v. Executive Airlines, Inc., 213 F.3d 25, 32-33 (1st Cir. 2000) (flight attendant with hearing loss in one ear not disabled where she was potentially precluded from flying on non-pressurized airplanes, but where, inter alia, she was still qualified for various ground positions at the airline, including receptionist, payroll clerk, and operational manager).

18

later as a computer service technician by a company that did not require him to lift or move computers).

Here, Gelabert supports her claim by presenting expert testimony from two individuals. That testimony falls far short. One of Gelabert's expert witnesses, Dr. Hector J. Guerra-Prado, a clinical psychologist, opined that Gelabert was limited to a range of light work. However, he identified only two types of positions Gelabert was precluded from performing -- (1) working as sewing machine operator and (2) doing secretarial and/or data entry work. As to the first, operating a sewing machine is not a job suited to someone of Gelabert's much broader (and different) job qualifications. As to the second, while her passenger services agent position at American involved some intense typing characteristic of secretarial and/or data entry work, Gelabert's education, skills, and work experience in no way suggest that intense typing, without breaks, is characteristic of jobs suitable for persons of her background and qualifications. Dr. Guerra also acknowledged that Gelabert could perform skilled tasks on a sustained basis and that she was qualified for other jobs at American.

In addition, Gelabert presented the affidavit of Dr. Fausto A. Boria, a psychiatrist. His affidavit simply parrots the language of Quint and the EEOC regulations, states that Gelabert is significantly limited in the major life activity of working, and concludes that the two jobs Gelabert wanted at American were reasonable accommodations

19

under the ADA. Such affidavits, consisting largely of legal conclusions, are not helpful. Moreover, Dr. Boria's conclusions depend on Dr. Guerra's findings, which, as we have concluded, do not show Gelabert is precluded from performing a class of jobs or a broad range of jobs in various classes. Indeed, Dr. Boria's affidavit falls short even of the vocational expert affidavit the Ninth Circuit found insufficient in Broussard v. University of California, 192 F.3d 1252, 1258-59 (9th Cir. 1999).

Gelabert relies heavily on Quint, supra, interpreting that case as holding that a restriction to light work is per se a substantial limitation on the major life activity of working. Her argument rests on a misinterpretation and is contrary to the "individualized inquiry" requirement. In fact, Quint rejected a per se rule that CTS was or was not an ADA disability. 172 F.3d at 13. The individualized inquiry in Quint established that plaintiff's work history consisted entirely of manual labor jobs, that such physically demanding jobs were the economic mainstay of her geographic area, that her education did not go beyond high school, and that she was disqualified from a broad range of jobs. See id. at 11-12. Quint also supported her claim with corroborative expert testimony. See id. at 12.

Here, by contrast, Gelabert has produced only generic evidence of her work restrictions, e.g., no intense typing or heavy

20

lifting, without showing how these restrictions substantially limit her ability to work in the San Juan area given her education, training, skills, abilities, and employment history.  While the burden of proof on an ADA plaintiff as to the number and types of jobs she can or cannot perform in the relevant labor market is not onerous, see id. at 12 (citing 29 C.F.R. Pt. 1630, App. § 1630.2(j)); see also Rockwell Int'l, 243 F.3d at 1017-18, Gelabert has offered no more than conclusory statements whose evidentiary value is dwarfed by evidence of the types of jobs she was still qualified to perform, including evidence of the jobs she actually did perform.

There is also no evidence American regarded Gelabert as disabled.  Indeed, American explicitly said it did not.  American's efforts to find another job for Gelabert, even while taking the position she was not disabled within the meaning of the ADA, belie the notion that American was motivated to discriminate based on stereotypes about disability.

There is no question that CTS is a physical impairment that has affected Gelabert's life.  There is also no question that CTS can in other circumstances substantially limit a person in the major life activity of working.  See, e.g., Wellington v. Lyon County Sch. Dist., 187 F.3d 1150, 1155 (9th Cir. 1999); Quint, 172 F.3d at 13.  But for Gelabert to prevail on her ADA claim, she must show that this condition substantially limits her in the major life activity of working.  Even

21

viewing the facts of record in the light most favorable to Gelabert, it plainly does not.  To the contrary, Gelabert's educational background, skills, abilities, and work experience have proven and continue to prove attractive to various employers, her CTS notwithstanding.  There is no evidence of an ADA violation.

## III.

The judgment of the district court dismissing the action is affirmed.

So ordered.