# United States Court of Appeals
## For the First Circuit

No. 01-2484

LYDIA GONZALEZ,

Plaintiff, Appellant,

v.

EL DIA, INC., et al.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. José Antonio Fusté, U.S. District Judge]

Before

Lynch, Circuit Judge,

Coffin and Cyr, Senior Circuit Judges.

Javier A. Morales Ramos, with whom Juan F. Matos Bonet was on brief for appellant.
Pedro J. Manzano-Yates, with whom Fiddler, Gonzalez & Rodriguez, LLP was on brief for appellees.

September 5, 2002

**CYR**, <u>**Senior Circuit Judge**</u>.  Appellant Lydia Gonzalez challenges various summary judgment rulings which prompted the district court to dismiss the claims she filed against her employer, El Dia, Inc., alleging that it violated the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 <u>et</u> <u>seq.</u>, the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 <u>et</u> <u>seq.</u>, and various Puerto Rico statutes.  The record facts are related in the light most favorable to Gonzalez.  <u>See</u> <u>Conto</u> v. <u>Concord Hosp., Inc.</u>, 265 F.3d 79, 80 n.1 (1st Cir. 2001).

I

<u>**BACKGROUND**</u>

In 1991, at age 58, Gonzalez was hired as a reporter by El Nuevo Dia, a Puerto Rico newspaper owned by defendant-appellee El Dia.  During the ensuing years, her supervisor, Maria Luisa Ferre, frequently stated, <u>inter</u> <u>alia</u>, that (i) Gonzalez' demeanor and couture were "[o]ut of style" and "colorless," and her coiffure ("like Phyllis Diller") was old-fashioned (<u>viz.</u>, "manias de vieja," or "old person's ways"); (ii) she should have retired and gone to live with her grandchildren in Florida long ago; and (iii) due to her age she would not live long enough to see her grandson play major league baseball.

On another occasion, after Ms. Ferre balked at Gonzalez' expression of interest in covering fashion shows, Gonzalez stated: "You want me to look like a Vogue model?"  Rather than responding,

2

Ms. Ferre simply stared at Gonzalez.  Moreover, Ms. Ferre routinely assigned younger reporters to cover the fashion shows and often told Gonzalez:  "Dona Lydia, I don't know what I'm going to do with you."

Similar remarks were made to Gonzalez by Jorge Mercado, the director of the human resources department, who frequently stated that Gonzalez had "manias de vieja."  Moreover, often as Gonzalez arrived at work in the morning, Mr. Mercado would accost her in the lobby and inquire:  "Mom, can I help you?" or "What did you come here for, to visit or to request a job?"  In addition, when Mr. Mercado visited the department in which Gonzalez worked, he would make such comments as:  "Are you still here?" or "I thought you had been discharged or terminated a long time ago."

Following a serious work-related injury in April 1997, Gonzalez applied to the State Insurance Fund (SIF) for workers' compensation benefits.  The SIF determined that Gonzalez should take medical leave while receiving treatment and rehabilitative therapy.  Apparently concerned about Gonzalez' extended absence from work, Ms. Ferre contacted the El Dia human resources department regarding retirement packages which might be offered Gonzalez.

On June 12, 1997, Gonzalez discussed her health problems and her job with Ms. Ferre.  At one point, Ms. Ferre asked Gonzalez whether she would like to retire, adding:  "Look, [] you are

already 63 years old and your health is not good." When Gonzalez responded that she did not wish to retire and instead offered to return to work immediately, Ms. Ferre rejected her offer and advised Gonzalez to take a vacation and return to work on July 1. As Gonzalez had no remaining paid-vacation time, however, and Ms. Ferre was well aware that Gonzalez was in difficult financial straits, Ms. Ferre offered to make an advance on Gonzalez' salary. Gonzalez promptly related the conversation to her former supervisor, Iris Landron. On the following day, El Dia issued a $6,000 check to Gonzalez. Although Gonzalez was surprised by the large amount and concerned about her ability to repay it, she nevertheless applied the entire advance toward her delinquent real estate mortgage.

On June 16, Mr. Mercado asked Gonzalez to come to his office, where she was presented with a resignation, release, and compensation agreement. Mr. Mercado asserted that during her June 12 meeting with Ms. Ferre, Gonzalez had agreed to execute these documents. Gonzalez denied any such agreement, refused to sign, and informed Mr. Mercado that she planned to return to work on June 19, rather than July 1. Upon returning to work on June 20, Gonzalez asked Mr. Mercado to draft an agreement, which she then signed, promising to repay the $6,000 advance by June 27.

On June 27, Gonzalez and her union representatives met with Mr. Mercado to explain that Gonzalez had been unable to obtain

4

a bank loan with which to repay her $6,000 debt to El Dia. Mr. Mercado rejected Gonzalez' alternative offer either to tender certain valuable artwork in lieu of cash or repay the loan through payroll deductions. After asserting that Gonzalez had breached the repayment agreement in "bad faith," Mr. Mercado suspended her without pay, albeit with benefits (_viz._, _e.g._, health and life insurance), until such time as she repaid the $6,000 advance.

As Gonzalez was left without a source of income, yet required to mitigate damages, she accepted a position as a staff reporter with The San Juan Star, an El Nuevo Dia competitor, then submitted a grievance against El Dia pursuant to the collective bargaining agreement (CBA). During the grievance proceeding, Gonzalez admitted to having worked for The San Juan Star. Thereafter, on July 15, 1997, Mr. Mercado terminated Gonzalez, citing the conflict-of-interest provision in the CBA; _viz._, "[r]eporters _working_ for the newspaper shall work exclusively on reporting news for [the newspaper], and thus shall not write articles and/or columns for any newspaper other than [El Nuevo Dia]."[1]  (Emphasis added.)

In August 1998, Gonzalez initiated the present action against El Dia, Ms. Ferre, and Mr. Mercado in the United States

---

[1]Gonzalez argues on appeal that the conflict-of-interest provision in the CBA is inapposite because she was not "working for" El Dia while she was suspended. As she failed to raise this claim in her opposition to El Dia's motion for summary judgment, however, it has been waived. _See_ _Davis_ v. _Lucent Techs., Inc._, 251 F.3d 227, 232 (1st Cir. 2001).

5

District Court for the District of Puerto Rico, alleging inter alia that her employment had been terminated in violation of the ADEA, the ADA, and various Commonwealth of Puerto Rico statutes. El Dia counterclaimed for its $6,000 advance to Gonzalez.

Ultimately, the district court entered summary judgment for El Dia, dismissed all claims in the Gonzalez complaint, and awarded El Dia summary judgment on its counterclaim.[2] On appeal, Gonzalez challenges the district court rulings which presaged the dismissal of her complaint.

## II

## DISCUSSION

Summary judgment rulings are reviewed de novo, after all the competent evidence and attendant reasonable inferences have been assessed in the light most favorable to the nonmoving party. See Conto, 265 F.3d at 80 n.1.[3] Moreover, rather than weigh the

---

[2]The earlier district court rulings, rejecting the Gonzalez claims against Ms. Ferre and Mr. Mercado in their individual capacities, are not before us on appeal.

[3]The district court granted summary judgment to El Dia on the grounds that: (i) the ageist comments attributed to Ms. Ferre, made before and on June 12, 1997, were not probative, in that it was Mr. Mercado, rather than Ms. Ferre, who determined that Gonzalez should be suspended and terminated; (ii) Gonzalez failed to establish that Mr. Mercado made any discriminatory remark, either proximate to, or in the context of, the decision to suspend and/or terminate Gonzalez; (iii) Gonzalez adduced no evidence that El Dia lacked legitimate alternative grounds for not assigning her to cover fashion shows; and (iv) the testimony given by Ms. Landron, Gonzalez' former supervisor — that the El Dia retirement offer was a subterfuge for age discrimination — constituted an inadmissible lay opinion, see Fed. R. Civ. P. 701.

6

credibility of the testimony, we presume that a rational factfinder would accept it as stated by the witness. See Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 55 (1st Cir. 2000).

## A.   The ADEA Claim

Under the ADEA, an employer may not "discharge . . . or otherwise discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of [her] age." 29 U.S.C. § 623(a)(1).[4] Gonzalez was required to comply with the familiar burden-sharing paradigm established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1995). Thus, at the outset she needed to tender enough evidence to establish a prima facie age-discrimination claim. See Dominguez-Cruz v. Suttle Caribe, Inc., 202 F.3d 424, 430 (1st Cir. 2000).[5] For present purposes, El Dia acknowledges that Gonzalez established a prima facie case under the ADEA. See id.

---

[4]Since many of the relevant legal standards applicable in employment-discrimination cases arising under the ADEA, the ADA, and Title VII are closely comparable, see Dichner v. Liberty Travel, 141 F.3d 24, 30 n.5 (1st Cir. 1998), we cite to them as appropriate.

[5]An ADEA claimant must adduce evidence that (1) she was at least forty years of age; (2) her job performance met the employer's legitimate expectations; (3) the employer subjected her to an adverse employment action (e.g., an actual or constructive discharge); and (4) the employer had a continuing need for the services provided by the position from which the claimant was discharged. See Suarez v. Pueblo Int'l, Inc., 229 F.3d 49, 53 (1st Cir. 2000).

7

The required prima-facie-case showing generates a rebuttable presumption that the defendant-employer violated the ADEA. Whereupon, the burden of production — as distinguished from the burden of proof — shifts to the defendant-employer to articulate a legitimate, nondiscriminatory basis for its adverse employment action. Once this limited burden has been met by the defendant-employer, the presumption which attended the prima facie case vanishes and the claimant must adduce sufficient creditable evidence that age was a motivating factor in the challenged employment action. See id. The plaintiff-employee may meet her burden of proof by showing that the employer's proffered reason for the challenged employment action was pretextual, see id. at 430 n.5, from which the factfinder in turn may, but need not, infer the alleged discriminatory animus. See Fite v. Digital Equip. Corp., 232 F.3d 3, 7 (1st Cir. 2000) (citing Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133 (2000)).

El Dia plainly met its circumscribed burden of production by identifying a nondiscriminatory basis for the Gonzalez discharge: i.e., her acceptance of employment as a reporter for a competing newspaper, in direct violation of the conflict-of-interest provision in the CBA. Cf., e.g., King v. Preferred Tech. Group, 166 F.3d 887, 893 (7th Cir. 1999) (Family and Medical Leave Act) (noting that violation of CBA provision by employee was legitimate nondiscriminatory basis for adverse employment action

8

taken by employer); <u>Burmistrz</u> v. <u>City of Chicago</u>, 186 F. Supp. 2d 863, 873-74 (N.D. Ill. 2002) (same, under ADA). Accordingly, the burden then shifted back to Gonzalez to prove that the nondiscriminatory basis assertedly relied upon by El Dia was merely a pretext, and that age animus was the real reason for her termination.

At this stage in the proceedings, Gonzalez cannot dispute that she knowingly failed to comply with the pertinent CBA provision, thereby entitling El Dia to discharge her. <u>See</u> <u>Mechniq</u> v. <u>Sears, Roebuck & Co.</u>, 864 F.2d 1359, 1365 (7th Cir. 1988) ("[Federal courts] do 'not sit as a super-personnel department that reexamines an entity's business decisions.' 'No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, [the ADEA does] not interfere.'") (citations omitted).[6] Accordingly, in order to establish that an age-based animus nonetheless constituted a motivating factor in the decision to terminate her employment, Gonzalez relies principally upon six varieties of evidence.

1. **The Ageist Remarks**

Gonzalez asserts that, prior to June 12, Mr. Mercado and Ms. Ferre engaged in a "pattern" of workplace remarks which demonstrate an age-based animus. <u>See</u> <u>supra</u> Section I. Upon closer

---

[6]Gonzalez abandoned her grievance under the CBA, which was then dismissed with prejudice.

examination, however, the stray remarks she identified afforded an inadequate foundation for the requisite discriminatory intent.

In the first place, "stray workplace remarks," as well as statements made either by nondecisionmakers or by decisionmakers not involved in the decisional process, normally are insufficient, standing alone, to establish either pretext or the requisite discriminatory animus. See Straughn v. Delta Air Lines, Inc., 250 F.3d 23, 36 (1st Cir. 2001); Laurin v. Providence Hosp., 150 F.3d 52, 58 (1st Cir. 1998). The Gonzalez deposition identified neither the time nor the context of the pre-June 12 remarks made by Mr. Mercado and Ms. Ferre, nor could Gonzalez state whether any particular remark had been made at a time proximate either to June 12 or to her July 15 termination. See, e.g., Dominguez-Cruz, 202 F.3d at 433 n.6 (noting "circumscribed" evidentiary weight of "temporally remote" statements).

Secondly, it is far from clear that the alleged remarks bespeak any age-based animus at all. See Fernandes v. Costa Bros. Masonry, Inc., 199 F.3d 572, 583 (1st Cir. 1999) (noting that "a statement that plausibly can be interpreted two different ways - one discriminatory and the other benign - does not directly reflect illegal animus") (emphasis added); Speen v. Crown Clothing Corp., 102 F.3d 625, 636 (1st Cir. 1996) ("'[A]mbiguous remarks, tending to suggest animus based on age, are insufficient, standing alone, to prove an employer's discriminatory intent.'") (citations

10

omitted; emphasis added); <u>Lehman</u> v. <u>Prudential Ins. Co. of Am.</u>, 74 F.3d 323, 329 (1st Cir. 1996) (same).

Some statements, such as those made by Mr. Mercado, merely displayed a measure of surprise that Gonzalez was still employed at El Dia, without either asserting or implying that she was too old to be working. Moreover, Mr. Mercado's alleged use of the salutation "Mom" — though no doubt insensitive, perhaps even rude — hardly constituted a self-sufficient foundation for an ADEA claim, especially since these particular attributions — motherhood and advanced age — plainly are not synonymous.

Similarly, the remarks Ms. Ferre allegedly directed at Gonzalez are reasonably susceptible to interpretation simply as descriptions of the somewhat dowdy appearance and demeanor which Gonzalez herself acknowledges. Moreover, the Spanish phrase "manias de vieja" ("old ways") did not unambiguously connote that Gonzalez was old, let alone <u>too old</u>, but rather that she acted in ways which did not appear in keeping with a person her age. <u>See</u>, <u>e.g.</u>, <u>Pearson</u> v. <u>City of Manhattan</u>, 33 F. Supp. 2d 1306, 1315 (D. Kan. 1999) (holding that phrase "old ways" not evidence of ADEA age-based animus, as such terms "apply more to a person's state of mind than to a person's age"); <u>Martin</u> v. <u>Ryder Distribution Res., Inc.</u>, 811 F. Supp. 658, 664 (S.D. Fla. 1992) (observing that simple references to the plaintiff-employees — as "good old boys" and "old-fashioned" — are insufficient evidence of age-based animus

11

under ADEA), aff'd, 16 F.3d 1232 (11th Cir. 1994). Nor did any other statement, attributed either to Mr. Mercado or Ms. Ferre, unambiguously communicate an age-based animus. Rather, their remarks are readily susceptible to interpretations which are in no sense discriminatory.

## 2. **The Fashion Show Coverage**

Similarly unavailing is the contention that the unexplained refusal to allow Gonzalez to cover fashion shows demonstrated an age-based animus. Given her acknowledged penchant for old-fashioned clothing and hairstyles, it seems much more plausible to attribute El Dia's decision to the fact that Gonzalez was insufficiently attuned to current fashions; and, therefore, that her representation of El Dia at fashion shows could very well reflect adversely upon its business image in such circles. Cf., e.g., Rogosin v. Mayor and City Council of Baltimore, 197 F. Supp. 2d 345, 351 (D. Md. 2002) (noting that employer has right under ADEA to consider plaintiff-employee's projection of "negative public image").

## 3. **The Ferre-Mercado "Conspiracy"**

Further, Gonzalez contends that since Ms. Ferre acknowledges that she contacted Mr. Mercado prior to June 12 in regard to the retirement plan, both should be considered El Dia decisionmakers, and that Ms. Ferre's remark on June 12 — viz., "you are already 63 years old and your health is not good" — accordingly

12

constituted a discriminatory statement by a decisionmaker in the context of the adverse employment action taken against her by El Dia.  The record on appeal does not square with her contention, however.

Instead, Ms. Ferre simply stated that she contacted the human resources department prior to June 12 regarding the retirement options available to Gonzalez.  There is no record support whatever for the notion that Ms. Ferre stated that she had spoken with Mr. Mercado about the matter.  Accordingly, no rational factfinder could construe Ms. Ferre's routine investigation into the retirement options available to Gonzalez as either (i) somehow sinister or (ii) a rational basis for surmising that Ms. Ferre played a meaningful role in Mr. Mercado's subsequent decisions to suspend and terminate Gonzalez.

### 4.    The Remarks Made by Ms. Ferre on June 12

On June 12, Ms. Ferre adverted to Gonzalez' age while the two were discussing Gonzalez' vacation plans and the retirement offer which had been made to her.  Of course the mere tender of a retirement proposal does not evince the requisite discriminatory animus.  See Baralt v. Nationwide Mut. Ins. Co., 251 F.3d 10, 16 n.7 (1st Cir. 2001), cert. denied, 122 S. Ct. 1064 (2002); Alvarez-Fonseca v. Pepsi Cola of P.R. Bottling Co., 152 F.3d 17, 27 (1st Cir. 1998).  Moreover, even viewed in the light most favorable to Gonzalez, Ms. Ferre's statement plainly conveyed the rational

13

concern that retirement might prove the more prudent course, especially since Gonzalez had been experiencing serious health problems, as well as financial difficulties. See Hoffman v. MCA, Inc., 144 F.3d 1117, 1122 (7th Cir. 1998) (finding no age-based animus in supervisor's mere observation that employee was "getting old"). Nor does Gonzalez contend that she felt pressured to retire by Ms. Ferre's reference to age. Cf. Sempier v. Johnson & Higgins, 45 F.3d 724, 732 (3d Cir. 1995) ("[A]n early retirement program designed to force employees who reach a senior age to leave or face significant pressure to resign or retire might itself create an inference of age discrimination.").

Yet more importantly, of course, the June 12 retirement-plan offer tendered by Ms. Ferre is not the adverse employment action at issue. Rather, the two pertinent employment decisions (viz., the suspension without pay and the ensuing termination) were made later, precipitated not by Gonzalez' age but by her acknowledged (i) delinquency in repaying the $6,000 advance when due, and (ii) violation of the conflict-of-interest provision in the CBA.

**5. The Allegedly False Communication by Ms. Ferre to Mr. Mercado**

Additionally, Gonzalez stresses that, after June 12, Ms. Ferre falsely informed Mr. Mercado that Gonzalez had accepted the retirement offer, thereby presumably causing the $6,000 check to issue and corroborating Gonzalez' acceptance, all in an elaborate

14

effort to force Gonzalez to leave her employment. Even viewed in the light most favorable to Gonzalez, see Conto, 265 F.3d at 80, n.1, any such inference would be highly speculative at the very least. We explain.

First, although at summary judgment we must credit the assertion attributed to Gonzalez on June 12 — that she never agreed to retire, see Santiago-Ramos, 217 F.3d at 55 — it does not follow that Ms. Ferre spoke untruthfully. Rather, Ms. Ferre simply may have misinterpreted Gonzalez' stated intentions. But more importantly, we are unable to conceive a plausible motive for Ms. Ferre to misrepresent Gonzalez' intentions. Had Gonzalez not desired or agreed — on June 12 — to retire, surely her mere acceptance of the $6,000 loan itself would not have pressured her into executing the retirement agreement, particularly in light of (i) Mr. Mercado's ready acceptance of Gonzalez' own characterization of the June 12 transaction as a loan transaction, and (ii) Mr. Mercado's willingness to accommodate her suggestion that a repayment agreement immediately be reduced to writing. Finally, Gonzalez' characterization of the $6,000 loan, as a mere salary advance, severely strains credulity, especially since she attested that she had been surprised by the large amount of the check and wondered how she would repay it. Accordingly, the record is devoid of creditable evidence that Ms. Ferre, in issuing the

15

$6,000 check to Gonzalez, harbored any illicit motive whatever, let alone an age-based animus.

### 6. **The Suspension Without Pay**

Finally, Gonzalez points to Mr. Mercado's rejection of her alternative proposals for repaying the $6,000 loan; i.e., through payroll deductions or by tendering "valuable artwork" in lieu of cash. Mr. Mercado suspended Gonzalez for acting in "bad faith," presumably because she had insisted, a mere seven days earlier, that Mr. Mercado draw up a repayment agreement. Inasmuch as Gonzalez was well aware on June 20 that she was in serious financial straits, her contention that she reasonably expected to obtain a bank loan within seven days seems suspect at best. As for her belated alternative repayment proposal, Gonzalez tendered no evidence that she possessed artwork with a ready fair-market value approaching $6,000. Cf., e.g., Wooten v. Ravkind (In re Dixon), 143 B.R. 671, 675 (Bankr. N.D. Tex. 1992) (noting market value of artwork often "speculative").

With regard to her contention that El Dia displayed an age-based animus by declining to allow her to repay the $6,000 debt in installments, Gonzalez cites but one instance in which El Dia ever allowed an employee an extension on the original repayment schedule. Moreover, in that case the employee was obligated to repay a mere $200, mistakenly disbursed by El Dia in the first instance, whereas the present record is devoid of any suggestion

16

that El Dia mistakenly disbursed the $6,000 loan to Gonzalez. Additionally, after she accepted the advance, Gonzalez knowingly and voluntarily executed a written agreement specifying the repayment terms. See Rodriguez-Cuervos v. Wal-Mart Stores, Inc., 181 F.3d 15, 21 (1st Cir. 1999) ("'[A] claim of disparate treatment based on comparative evidence must rest on proof that the proposed analogue is similarly situated in all material respects.'") (citation omitted).

Further, Gonzalez asserts that Mr. Mercado demonstrated an age-based animus, in that his decision to suspend her without pay created a Catch-22; i.e., without a salary she would be unable to repay the $6,000 and return to work at El Dia, yet her prior work experience qualified her only for work as a reporter. Alternatively, were she to accept work as a reporter for a competing newspaper she would be in violation of the anti-conflict-of-interest provision in the CBA. This thesis fails the reasonable plausibility test as well.

First, as already noted, Gonzalez claimed that she owned artwork worth $6,000, which, if sold on the open market, would have enabled her to repay the $6,000 loan and return to work at El Dia almost immediately. Second, and more importantly, her contention that she was qualified to work only as a reporter is both conclusory and without record support. That is to say, presumably an experienced reporter would possess the requisite qualifications

17

for various other positions requiring research and writing skills, but would not trigger the narrowly written conflict-of-interest provision in the CBA. See supra Section I. Yet Gonzalez made no attempt to demonstrate that no such positions were available in the relevant geographic area.

Accordingly, as it would be overly speculative to infer an age-based animus from the evidence contained in the record on appeal, the district court ruling rejecting the Rule 56 proffer by Gonzalez must be affirmed.[7]

## B.    The ADA Claim

The ADA prescribes that no employer "shall discriminate against a qualified individual with a disability because of the disability of such individual." 42 U.S.C. § 12112(a) (emphasis added). The term "disability" is defined as "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." Id. § 12102(2)(A). Gonzalez insists that she tendered enough competent Rule 56 evidence from which the trier of fact might reasonably infer that her various orthopedic conditions, including back, neck and leg pain, constitute a "disability" which substantially limits her ability to

---

[7]The district court order dismissing the Law 100 claim must be affirmed as well, since the merits of the age-discrimination claims asserted under the ADEA and Law 100, see 29 P.R. Laws Ann. §§ 146-151, are coterminous.

18

work, and that El Dia violated the ADA by failing to make a "reasonable accommodation." Id. § 12112(b)(5)(A).

Assuming arguendo that Gonzalez established that her orthopedic problems meet the "physical impairment" requirement, see Gelabert-Ladenheim v. Am. Airlines, Inc., 252 F.3d 54, 58 (1st Cir. 2001); 29 C.F.R. § 1630.2(i), the remaining issue is whether she adduced sufficient evidence to establish that her impairment "substantially limits" her ability to work. Although the term "substantially limits" is not defined in the ADA, the related EEOC regulations define it as either (i) the inability "to perform a major life activity that the average person in the general population can perform," or (ii) being "[s]ignificantly restricted as to the condition, manner or duration under which [one] can perform a particular major life activity as compared to the condition, manner or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j)(1); see also Toyota Motor Mfg., Kentucky, Inc. v. Williams, 534 U.S. 184, 122 S. Ct. 681 (2002).

The relevant elements to be considered include: (i) the nature or severity of the impairment; (ii) its expected duration; and (iii) its anticipated long-term impact. See id. § 1630.2(j)(2). Where the major life activity at issue is "working," additional factors include: (i) the geographical area to which plaintiff has reasonable access; (ii) the number of jobs in that

19

geographical area which require the same abilities as plaintiff's former job, but from which plaintiff would be disqualified due to her impairment; and (iii) the number of jobs in that geographical area which do not require the same abilities as plaintiff's former job, but from which plaintiff would be disqualified due to her impairment. See id. § 1630.2(j)(3).

Evaluated against these standards the Rule 56 proffer presented by Gonzalez is sparse, to say the least. For instance, she attests that her impairment made it difficult to walk and impossible to sit for extended periods of time. Her physician diagnosed diabetes and obesity, and determined that after 1995 Gonzalez had become "significantly restricted to (sic) work as compared to the average person in the working community and the condition, manner or duration under which she can work are significantly restricted." Moreover, her proffer was inadequate for the following reasons as well.

First, Gonzalez tendered no evidence that her impairments rendered her unable to perform a broad range of jobs, as distinguished from the particular job she held at El Nuevo Dia immediately prior to her termination. See Sutton v. United Air Lines, Inc., 527 U.S. 471, 492 (1999); Gelabert-Ladenheim, 252 F.3d at 58-59 (noting that ADA requires an "individualized inquiry," and "[w]hen the major life activity of working is at issue . . . the plaintiff 'assumes a more fact-specific burden of proof'")

20

(citation omitted); 29 C.F.R. § 1630.2(j)(3)(i) (same). Nor did she adduce any evidence as to the employment demographics in the relevant geographic area, from which a factfinder rationally might assess the appropriate section 1630.2(j)(3) criteria. Cf. Quint v. A.E. Staley Mfg. Co., 172 F.3d 1, 12 (1st Cir. 1999) (finding that plaintiff-employee adduced sufficient evidence of relevant demographics). The latter omission is especially serious given Gonzalez' testimony that she went to work as a reporter for The San Juan Star, without providing any indication as to whether she requested a reasonable accommodation or The Star acceded to any such request.

Second, the testimony presented by the treating physician is highly conclusory. "It is insufficient for individuals attempting to prove disability status . . . to merely submit evidence of a medical diagnosis of an impairment." Toyota Motor, 122 S. Ct. at 691; see Sutton, 527 U.S. at 483 ("'The determination of whether an individual has a disability is not necessarily based on the name or diagnosis of the impairment.'") (citing 29 C.F.R. § 1630.2(j)). Yet, rather than documenting precisely how Gonzalez' ability to work has been affected by her impairments, the treating physician simply parroted the definition of the term "substantially limits" contained in the EEOC regulations, which plainly would not enable a rational trier of fact to undertake the case-by-case

21

assessment demanded under the ADA.  See Toyota Motor, 122 S. Ct. at 692.  Consequently, the ADA claim was properly dismissed.[8]

## C.    The Statutory Claims Under Puerto Rico Law

Further, Gonzalez argues on appeal that the district court judgment dismissing her Law 80 "unjust discharge" claim, see 29 P.R. Laws Ann. § 185a-185m, should be set aside.  Yet, as El Dia points out, Gonzalez failed to oppose dismissal of the Law 80 claim in her opposition to its motion for summary judgment before the district court.  Consequently, this contention has been waived. See Davis v. Lucent Techs., Inc., 251 F.3d 227, 232 (1st Cir. 2001).  Moreover, Gonzalez has submitted no reply brief relating to the merits of the waiver argument advanced by El Dia on appeal.[9]

Even if we were to reach the merits of the Law 80 claim, however, it is extremely doubtful that Gonzalez would fare any better.  After she established by a preponderance of the evidence that she had been discharged, the burden shifted to El Dia to show "just cause" for the dismissal.  See Alvarez-Fonseca v. Pepsi Cola of P.R. Bottling Co., 152 F.3d 17, 28 (1st Cir. 1998).  Gonzalez

---

[8]As Gonzalez acknowledges that the Law 44 claim, see 1 P.R. Laws Ann. § 501,  is coterminous with her ADA claim, see Acevedo Lopez v. Police Dep't of P.R., 247 F.3d 26, 29 (1st Cir. 2001), its dismissal by the district court must be affirmed as well.

[9]Thus, it is unnecessary to determine whether, in the exercise of our discretion, the waiver should be overlooked, given that the district court nevertheless reached and determined the matter on the merits in its final judgment.  Cf., e.g., Shannon v. Ford Motor Co., 72 F.3d 678, 684 (8th Cir. 1996).

22

suggests that an employer normally may not establish "just cause" where the employee was without adequate advance notice of the consequences of her actions, <u>viz.</u>, constructive or actual discharge, and that an employee can only be placed on notice once she has engaged in a series of infractions. <u>See</u> 29 P.R. Laws § 185b(a) (noting that "just cause" may be established where "the worker indulge[d] in a pattern of improper or disorderly conduct"); § 185b(c) (noting that "just cause" may exist where employer can demonstrate "[t]he employee's repeated violations of the reasonable rules and regulations established for the operation of the establishment, provided a written copy thereof has been opportunely furnished to the employee"); <u>cf.</u> <u>Alvarez-Fonseca</u>, 152 F.3d at 28. This suggestion is flawed as well.

First, Law 80 does not invariably require repeated violations, particularly where an initial offense is so serious, or so reflects upon the employee's character, that the employer reasonably should not be expected to await further occurrences. <u>See</u> <u>Delgado Zayas</u> v. <u>Hosp. Interamericano de Medecina Avanzada</u>, 137 D.P.R. 643, 650 (1994). The conflict-of-interest provision not only treats with serious matters relating to employee trustworthiness and loyalty, but El Dia considered it sufficiently important to include it in the CBA.

Lastly, Gonzalez ignores the fact that, arguably at least, she engaged in a <u>series</u> <u>of</u> <u>infractions</u>. She defaulted on a

23

promissory note which she had insisted that Mr. Mercado draw up, and thereafter deliberately went to work for a competing newspaper in direct contravention of the CBA.  See Amalgamated Transit Union v. City of Okla. City, 710 F. Supp. 1321, 1328 (W.D. Okla. 1988) (presuming employees on notice of all pertinent CBA provisions). Thus, no rational jury reasonably could conclude that El Dia lacked "just cause" to terminate Gonzalez, even if Law 80 did invariably require repeated violations, which it does not.

**Affirmed.  Costs to appellees**.