Nelson VELÁZQUEZ FERNANDEZ,
et al., Plaintiffs,

v.

NCE FOODS, INC., et al., Defendants

No. CIV. 04–2241(JP).

United States District Court,
D. Puerto Rico.

Nov. 29, 2005.

Alicia I. Lavergne–Ramírez, Carlos G. Colón–Machargo, Lavergne Ramírez & Colón Machargo, P.S.C., San Juan, PR, María A. Mercado–Betancourt, María V. Múnera–Pascual, Múnera & Mercado, San Juan, PR, for Plaintiff.

Carl E. Schuster, Lourdes C. Hernández–Venegas, Ricardo Guzmán–López de Victoria, María L. Santiago–Ramos, Schuster, Usera & Aguiló, LLP, San Juan, PR, for Defendant.

### OPINION AND ORDER

PIERAS, Senior District Judge.

## I. INTRODUCTION

Before the Court is the defendants' "Motion for Summary Judgment" (No. 27); the defendants' "Statement of Uncontested Facts in Support of Motion for Summary Judgment" (No. 29), the defendants' "Memorandum of Law in Support of Motion Requesting Summary Judgment" (No. 30), the plaintiffs' opposition thereto (Nos.32, 33, 34), the defendants' reply to the plaintiffs' opposition (Nos. 43 and 44), the plaintiffs' surreply (No. 51), the defendants' "Supplemental Statement of Uncontested Facts in Support of Motion for Summary Judgment and in Compliance with Court Order" (No. 55–1), and the plaintiffs' response (No. 57).

The plaintiffs in this case are Nelson E. Velázquez–Fernandez, and Jose R. Rivera–Rosado. The defendants are NCE Food, Inc. ("NCE Foods"), and Metropolitan Food Services, Inc. ("Metropolitan Food Services"). The plaintiffs are former employees of the defendants, and allege that the defendants unlawfully terminated their employment because of age discrimination and failed to pay them overtime compensation.

The defendants now move for summary dismissal of the plaintiffs' claims on three grounds: that the plaintiffs' ADEA claims are insufficient to create a cause of action under the law and are unsupported by the evidence, that defendant NCE Food set forth has legitimate and non-discriminatory reasons for plaintiff Rivera's termination and for the elimination of plaintiff Velázquez's position at NCE Foods, and that both of the plaintiffs are exempt employees and therefore not entitled to overtime compensation or compensation for work performed during meal periods. For the following reasons, the Court hereby **GRANTS IN PART AND DENIES IN PART** the defendants' motion.

## II. MATERIAL FACTS NOT IN GENUINE ISSUE OR DISPUTE

After thoroughly evaluating the parties' stipulations in the record, the defendants' statement of uncontested facts and supporting evidence, and the plaintiffs' opposition thereto, the Court determined that the following material facts are not in genuine issue or dispute:

1. NCE Foods is a corporation engaged in the warehousing and distribution of food products. As such, it has to comply with several local and federal regulations relating to the storage, handling, and transportation of frozen food. Metropolitan is a corporation which provides cafeteria services to several enterprises, such as hospitals and pharmaceutical companies.

2. NCE and Metropolitan have been authorized to do and are currently doing business in the Commonwealth of Puerto Rico.

3. NCE Foods supplies food products to Metropolitan's cafeterias.

4. At all times relevant to this action NCE Foods' clients included entities not directly affiliated to Metropolitan.

5. At all times relevant to this action, NCE Foods and Metropolitan have been separate corporations authorized to do business in Puerto Rico.

6. At all times relevant to this action, Metropolitan's physical address has been 464 José Canals Street, Hato Rey, while NCE Foods physical address has been Carolina Industrial Park, Building No. 1, Carolina.

7. Metropolitan is a for profit corporation which was organized under the Laws of Puerto Rico on January 27, 1970.

8. NCE Foods is a for profit organization which was organized under the Laws of Puerto Rico on March 3, 1994.

9. NCE Foods' sole stockholder from 1998 to July, 2002, was Valentín Navarro. From July, 2002, until the present, the stockholders were Ivan Navarro, Veronica Navarro, Viviana Navarro, and Alejandro González.

10. Metropolitan's stockholders from 1998 to July of 2002 were Valentín Navarro Faría and Valentín Navarro Rodríguez. From August of 2002 to July of 2003 its stockholders were Valentín Navarro Faría, Edwina Navarro, Ivan Navarro, Viviana Navarro, and Verónica Navarro. From August, 2003, until the present, Metropolitan's stockholders were Lydia Rodríguez de Navarro, María del Carmen Navarro Rodríguez, Gerardo Navarro Rodríguez, Edwina Navarro, Ivan Navarro, Viviana Navarro, and Verónica Navarro.

11. From 1985 to January, 1998, Rivera was employed by Metropolitan as a Manager.

12. At all times relevant to this action Angel Rodríguez occupied the position of President of Metropolitan Foods Services. Rodríguez would communicate with Rivera to inquire about incomplete deliveries.

13. Incomplete deliveries increased in the last year in which Rivera was in charge of NCE Foods' warehouse.

14. Rivera's duties and responsibilities as a Manager with Metropolitan included, amongst others, the supervision of employees.

15. While employed as a Manager with Metropolitan, Metropolitan advised Rivera in writing of the fact that he needed to learn to manage his temper in moments of stress.

16. On or about January 30, 1998, Rivera presented a written letter of resignation to Metropolitan. However, his work with Metropolitan continued until March 27, 1998.

17. On or about April 1, 1998, Rivera started to work with NCE Foods in the capacity of Warehouse Manager.

18. Rivera was appointed to this position following the resignation of the prior Warehouse Manager, Eluid Soto.

19. Upon Soto's resignation, NCE Foods President Valentín Navarro contacted Rivera directly and offered him the Warehouse Manager position.

20. In his capacity as Warehouse Manager, Rivera was responsible for the day to day management of NCE Foods warehouse in Puerto Rico.

21. As Warehouse Manager, Rivera's duties included opening and closing NCE's warehouse, receiving merchandise from suppliers, taking orders from clients, preparing invoices, stocking merchandise with a fingerlift, receiving quotes from suppliers, providing maintenance to trucks, supervising warehouse personnel, administering the company's inventory, assuring compliance with internal and external regulations, assuring excellent customer service, resolving customer complaints, processing claims to suppliers, housekeeping of the warehouse operation, verifying the equipment's proper functioning, preparing and verifying reports to upper management, efficient assignment of the personnel and preparation of work schedules, verifying that the company's vehicles be provided with adequate maintenance, and other related administrative duties.

22. From April, 1998, until July, 2002, Rivera reported directly to Valentín Navarro.

23. After Valentín Navarro's death in July, 2002, Rivera began to report to Edwina Navarro.

24. At all times relevant to this action, Valentín Navarro and his family, including Edwina Navarro, their son Ivan, and their daughters Vivian and Veronica, were stationed in Tampa, Florida. Accordingly, Valentín Navarro's supervision of Rivera was primarily done through telephone conversations and occasional business trips to Puerto Rico.

25. At all times relevant to this action, NCE Foods had from seven (7) to ten (10) employees.

26. These employees reported to Rivera.

27. In general, Valentín Navarro had a liberal management style with which Rivera felt comfortable.

28. While he reported to Valentín Navarro, Rivera had a very good relationship with him and had no complaints about him.

29. In January, 2001, during one of his business trips to Puerto Rico, Valentín Navarro met personally with Rivera to discuss several issues concerning NCE Foods operation. Following the conversation, Mr. Navarro sent a formal memorandum to Rivera in which he confirmed the issues discussed.

30. In his January, 2001, memorandum to Rivera, Valentín Navarro addressed the following issues: (a) the Company's overtime expenses had increased instead of decreasing and that Mr. Navarro expected Rivera to eliminate the need for overtime, (b) plaintiff Nelson Velázquez, who occupied the position of NCE Foods salesperson, failed to visit NCE Foods client cafeterias after his initial visit to their facilities, and (c) an issue with the company truck. In the memorandum, Valentín Navarro stressed that he expected Rivera to address the second issue with Velázquez and to provide him with clear and precise instructions on the issue so that NCE Foods sales could be increased.

31. In July, 2002, Valentín Navarro unexpectedly passed away. After his death his widow, Edwina Navarro, assumed his responsibilities over NCE Foods operation.

32. Prior to July, 2002, Edwina Navarro had been involved with NCE Foods accounts payables and receivables.

33. Prior to July, 2002, Edwina Navarro was involved with neither Rivera's supervision nor the company's day to day operation.

34. Prior to July, 2002, Edwina Navarro rarely visited Puerto Rico. In order to familiarize herself with the NCE Foods operation, Mrs. Navarro started to visit NCE Foods facilities on a monthly or bimonthly basis. In addition, she would hold telephone conversations with Rivera or with his assistant. Rivera would meet personally with Edwina Navarro for approximately three or four hours per month.

35. Edwina Navarro's management style was different than Valentín Navarros management style; she exerted closer control over NCE Foods operations.

36. Edwina Navarro increasingly became directly involved with things such as customer complaints, and sought alternatives to improve the company's overall operation while reducing costs.

37. From the beginning, Edwina Navarro perceived that Rivera resented her supervision. Edwina Navarro perceived that on occasions Rivera would avoid talking to her and would also question and/or disobey her directives.

38. On January 22, 2003, Edwina Navarro sent a memorandum to Rivera in connection with a complaint that she had received from an NCE Foods client.

39. In her January 22, 2003, memorandum to Rivera, Edwina Navarro discussed the following issues concerning the client complaint: (a) Frozen foods had been delivered to the client in a vehicle not suitable

for that purpose. Edwina Navarro specifically stated that the client had brought to her attention its concern that by doing so, the products had been exposed to potential contamination. Edwina Navarro stressed that Rivera was well aware of the fact that this type of delivery constituted an unacceptable practice. (b) The delivery at issue was done in four (4) trips. The client specifically complained to Edwina Navarro about the fact that it did not have the personnel to receive so many deliveries.

40. In her January 22, 2003, memorandum, Edwina Navarro also pointed out to Rivera the need to implement immediate remedial actions in connection with the following areas: (a) eliminating the unauthorized delivery of frozen food in vehicles not suitable for said purpose, (b) communicating to the clients any unexpected changes in their routes, and in such situations, seeking alternatives suitable to the clients' needs and operations, © organizing tasks efficiently in order to avoid delivery issues as well as unnecessary expenses to NCE Foods.

41. In addition to sending her memorandum to Rivera, Edwina Navarro discussed these issues with him.

42. Following her January 22, 2003, memorandum, Edwina Navarro visited NCE Foods with the purpose of analyzing the company's day to day operation. Her observations during the visit increased her concerns about the manner in which Rivera was handling the operation.

43. In a memorandum to Rivera dated March 6, 2003, Edwina Navarro addressed several concerns that she had previously discussed with him.

The areas addressed in said memorandum included the following: (a) The need to prepare on a daily basis a list of the products of which there was a limited supply in the warehouse in order to avoid not being able to sell these products to the clients for failure to place a timely purchase order of the same. Edwina Navarro reminded Rivera that a purchase order should be placed before the warehouse runs out of the product. Edwina Navarro received all the paper work related to purchase orders. At the end of the month she could determine how much money NCE Foods was losing as a result of not having certain products at the warehouse. (b) The need to give clients twenty-four hours notice when NCE Foods did not have the product available in the warehouse, so that the clients could make other arrangements. Edwina Navarro had received complaints from clients that NCE Foods management failed to inform them when certain products were not available. (c) A list of the products purchased by NCE Foods warehouse from the United States needed to be prepared in order to determine the frequency of their sale and to maintain an adequate inventory of said products in order to be able to satisfy customer needs. (d) The importance of keeping the computerized inventory up to date. Whenever merchandise was returned to the NCE Foods warehouse, or in those occasions in which a delivery of dispatched products could not be made to a client, the merchandise at issue needed to be re-entered in the computerized inventory. Afterwards, the physical (actual) inventory

should be compared with what the computerized inventory reflected in order to avoid inconsistencies. (e) Credit claims to suppliers should be presented immediately after NCE Foods had realized that a given merchandise was damaged or dented. (f) NCE Foods's warehouse should be organized so that related goods would be found close together. (g) The company freezer and refrigerator should be kept organized at all times so that new merchandise could be easily rotated. (h) The freezer and the refrigerator's temperature should be verified at the beginning and at the end of the working day. (i) Whenever an employee would take merchandise out of the warehouse, the employee should sign the corresponding documentation and be accountable for any errors in its dispatching. (j) The warehouse's physical inventory should be taken on a monthly basis.

44. In the March 6, 2003, memorandum, Edwina Navarro also stated that a physical inventory taken in December 2002 had shown inconsistencies that were affecting NCE Foods's operation.

45. Edwina Navarro met with Rivera to discuss the contents of the memorandum.

46. On June 20, 2003, Proctor & Gamble and Davis & Geck cafeterias refused to receive NCE Foods products, because they were not delivered at the scheduled hours and the cafeterias would not have the personnel to handle the merchandise upon its arrival.

47. On June 23, 2003, Angel Rodríguez, President of Metropolitan Foods, complained to Edwina Navarro that NCE Foods merchandise scheduled for delivery that morning to cafeterias at Cosvi, the Cardiovascular Hospital, and Lederle, had not been delivered as of 2:00 p.m. that day.

48. This situation was "quite embarrassing" to Edwina Navarro. On June 23, 2003, NCE Foods delivered frozen merchandise in a company car.

49. By authorizing delivery of frozen merchandise in the company car, Rivera placed the company's operation at risk of being cited for the inappropriate transportation of frozen food.

50. Rivera told Edwina Navarro that the warehouse employees would not cooperate with him.

51. On June 25, 2003, there was a meeting of NCE Foods personnel. Present at the meeting were Edwina Navarro, Ivan Navarro, Rivera, and the warehouse employees.

52. Edwina Navarro scheduled the meeting to address with Rivera's subordinates the reasons why they were allegedly not cooperating with Rivera.

53. During the meeting, each employee was given time to address his or her concerns, and employees commented on Rivera's management.

54. Upon hearing the employees' comments, Rivera's demeanor became aggressive and he became upset.

55. During the meeting Rivera pointed at people, and announced that what participants had expressed at the meeting was "blabbermouth."

56. Edwina Navarro considered this comment to be disrespectful of the warehouse employees and of her.

57. On June 26, 2003, Edwina Navarro sent a memorandum to Rivera regarding the events of June 20, 2003, through June 25, 2003.

58. Edwina Navarro met with Rivera to discuss the June 26, 2003, memorandum.

59. On June 27, 2003, Edwina Navarro told Rivera by memorandum that for the mutual benefit of NCE Foods and Rivera, Rivera would take a two (2) week vacation from June 30, 2003, until July 14, 2003.

60. In the June 27, 2003, memorandum, Edwina Navarro told Rivera that his attitude toward certain circumstances adversely affected the functioning of NCE Foods.

61. In the June 27, 2003, memorandum, Edwina Navarro told Rivera that during his vacation he should reflect on his attitude and duties to the company, and that she expected to see positive changes upon his return.

62. In the June 27, 2003, memorandum, Edwina Navarro told Rivera that if his attitude persisted after he returned, NCE Foods would be forced to take other measures, such as terminating his employment.

63. Edwina Navarro instructed Rivera to write down "what things [he] could do to improve [himself] and that would help the company."

64. Edwina Navarro and Rivera agreed that he would present the written report to Edwina Navarro during the month of July.

65. Rivera returned to work on July 14, 2003.

66. Following his return from his vacation, Rivera worked for two weeks at NCE Foods.

67. On July 18, 2003, one of Mova Pharm's cafeteria managers called Rivera requesting delivery of certain frozen merchandise. The refrigerated delivery truck was not available. Navarro and Angel Rodríguez, President of Metropolitan, authorized Rivera to deliver goods in a non-refrigerated truck.

68. At the end of July, 2003, Edwina Navarro met with Rivera to discuss the report she instructed him to prepare.

69. At the meeting, Rivera told Edwina Navarro that he had not completed the report during the vacation or during two weeks after he had returned to work.

70. At this time, Edwina Navarro decided to terminate Rivera's employment at NCE Foods.

71. The decision to terminate Rivera's employment at NCE Foods was made solely by Edwina Navarro. Edwina Navarro was fifty-three (53) years old when Rivera's employment was terminated.

72. In August, 2003, Rivera was replaced by Joel Pagán, who had been employed with NCE Foods prior to Rivera's appointment as Warehouse manager.

73. Rivera considered Pagán to be a very good employee.

74. Until Valentín Navarro passed away in July, 2002, Rivera was in charge of recruiting NCE Foods personnel.

75. Rivera has personal knowledge of NCE Foods hiring only two younger employees during the time he reported to Edwina Navarro.

76. Before they were hired, Rivera interviewed both the employees and

gave positive reviews to Edwina Navarro on behalf of both.

77. Rivera interviewed about five (5) candidates for the positions and gave feedback to Edwina Navarro on them.

78. The two employees were hired as hourly employees.

79. At all times relevant to this action, an employee by the name of Carlos Negrón worked for NCE Foods.

80. Negrón is over fifty years old.

81. After Rivera's termination, two employees over forty years old were hired, namely Miguel Alejandro, born September 29, 1957, and Luis Lamut, born September 17, 1955.

82. While Rivera was Warehouse Manager for NCE Foods he considered himself to be a managerial, rather than an hourly employee.

83. While Rivera reported to Edwina Navarro, she implemented several changes to improve NCE Foods finances.

84. These changes affected all of NCE Foods employees.

85. Rivera's compensation and benefits, however, were not decreased while he reported to Edwina Navarro.

86. Co–Plaintiff Velázquez was hired as a "Clerk" by Metropolitan in 1986.

87. Velázquez became an NCE Foods employee in 1990.

88. At all times relevant to this action, Velázquez reported directly to Rivera.

89. Once Rivera became NCE Foods Warehouse Manager, he increasingly started to use Velázquez as his assistant.

90. Whenever Rivera was not present, Velázquez would be the person in charge of the warehouse's operations, including the supervision of the employees.

91. Rivera considered Velázquez to be "his right hand" in terms of NCE Foods' management.

92. Because Velázquez was helping with the warehouse's management his contact with the clients to sell products would be made over the phone.

93. During the last five (5) years of his employment with NCE Foods, Velázquez did not visit NCE Foods clients personally.

94. After Edwina Navarro became in charge of the NCE Foods operation, there was a period of time in which she insisted that Velázquez visit clients personally in order to increase the company's sales.

95. Rivera claims he convinced Edwina Navarro that NCE Foods did not need a full time salesperson who would personally visit the clients, and that Velázquez was more effective working full time at the warehouse.

96. Rivera claims he convinced Edwina Navarro that Velázquez could continue calling the clients from the warehouse while assisting him with the management of the warehouse and the supervision of the employees.

97. On April 15, 2003, Edwina Navarro met with Velázquez regarding his employment.

98. Navarro informed Velázquez that his position at NCE Foods had been eliminated and offered him a new position as Warehouse Assistant.

99. Rodríguez was present at the meeting.

100. At that time, Velázquez was provided with a letter dated April 2, 2003.

101. Navarro took notes on a sheet of paper that she handed to Velázquez stating the terms of a new position as a Warehouse Assistant Manager that was offered to him.

102. Said new position represented a reduction in salary and benefits.

103. Velázquez was advised that at the new position, he would no longer be entitled to a car allowance, nor to a company car, but he would continue to receive his same salary, a performance bonus, a Christmas bonus, and his medical insurance plan.

104. The new position would not involve visiting NCE Foods clients personally, and therefore would not necessitate the use of a company car.

105. Terms of the new position were confirmed in writing.

106. Following the meeting, Velázquez did not make any effort to communicate with Edwina Navarro, and he did not report back to work with NCE Foods.

107. Velázquez described his relationship with Mrs. Navarro as a very cordial one throughout the whole period of time that he worked for NCE Foods.

108. While employed with NCE Foods, Velázquez recommended four (4) employees who were all interviewed by Rivera and hired by Rivera on behalf of NCE Foods.

109. Velázquez never complained to Edwina Navarro about his work schedule nor about any other matter during his employment at NCE Foods.

110. Throughout his years of service with Defendants, Velázquez was never admonished in writing.

111. After Velázquez's employment with NCE Foods, NCE Foods did not hire any person to perform sales duties.

112. Rivera's monthly salary immediately prior to his termination was $3,200.

113. Velázquez earned a salary of $440.57 per week immediately prior to his termination from NCE Foods.

## III. STANDARD

Summary judgment serves to assess the proof to determine if there is a genuine need for trial. *Garside v. Osco Drug, Inc.,* 895 F.2d 46, 50 (1st Cir.1990). Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate when "the record, including the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, viewed in the light most favorable to the nonmoving party, [in this case the plaintiff,] reveals no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56©; *see also Zambrana–Marrero v. Suárez–Cruz,* 172 F.3d 122, 125 (1st Cir.1999) (stating that summary judgment is appropriate when, after evaluating the record in the light most favorable to the non-moving party, the evidence "fails to yield a trial worthy issue as to some material fact"); *Goldman v. First Nat'l Bank of Boston,* 985 F.2d 1113, 1116 (1st Cir.1993); *Canal Insurance Co. v. Benner,* 980 F.2d 23, 25 (1st Cir.1992). The Supreme Court has stated that "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judg-

ment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In this way, a fact is material if, based on the substantive law at issue, it might affect the outcome of the case. *See Mack v. Great Atl. and Pac. Tea Co., Inc.,* 871 F.2d 179, 181 (1st Cir.1989).

In a summary judgment motion, the movant bears the burden of "informing the district court of the basis for its motion and identifying those portions of the [record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Once the movant meets this burden, the burden shifts to the opposing party who may not rest upon mere allegations or denials of the pleadings, but must affirmatively show, through the filing of supporting affidavits or otherwise, that there is a genuine issue of material fact for trial. *See Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Goldman,* 985 F.2d at 1116.

## IV. CONCLUSIONS OF LAW

### A. ADEA

■ The ADEA makes it unlawful for an employer "to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). In order to prevail on a claim of pretextual age discrimination, an ADEA claimant who lacks direct evidence of age discrimination must first make out a prima facie case triggering a rebuttable presumption of age discrimination by showing that (1) he was at least forty years of age; (2) his job performance met the employer's legitimate expectations; (3) the employer subjected him to an adverse employment action; and (4) the employer had a continuing need for the services provided by the position from which the claimant was discharged. *Gonzalez v. El Dia, Inc.,* 304 F.3d 63, 68 n. 5 (1st Cir.2002). Upon a sufficient showing, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory basis for its adverse employment action. *Id.* at 69. Once an employer has made a successful proffer, the claimant must then establish that the employer's given reason was pretextual and that the record evidence would permit a reasonable jury to infer that the real reason was discriminatory animus based on his age. *Id.* at 69.

### 1. Rivera's ADEA Claim

■ Even assuming that Rivera was able to establish a prima facie case of age discrimination, the Court concludes that the defendants are entitled to summary judgment on Rivera's ADEA claim, because they articulated a legitimate nondiscriminatory reason for firing Rivera and the plaintiffs proffered no evidence that the defendants articulated reason was mere pretext for discriminatory animus.

The defendants argue that NCE Foods terminated Rivera's employment because of his inadequate job performance and failure to follow instructions of NCE Foods President Edwina Navarro. The affidavit of Edwina Navarro describes several events between January and July of 2003, that she declares led to her decision to terminate Rivera's employment. Clients complained about problems with NCE Foods deliveries, and about NCE Foods management not calling them back when certain products were unavailable. Rivera authorized the delivery of frozen food in unsuitable vehicles, potentially exposing the food to contamination. Rivera failed to take a monthly inventory against Na-

varro's instructions. During a meeting with warehouse employees, Navarro observed that Rivera became aggressive, pointed at people and announced that what participants had expressed at the meeting was "blabbermouth." Navarro considered his behavior at the meeting to be disrespectful to her and to other employees. She instructed him to provide her with a written report during the month of July, and he failed to prepare it. According to Navarro's affidavit she fired Rivera "[b]ased on all the above facts and [her] belief that there was nothing more that could be done about it." Thus the defendants satisfy their burden to articulate a legitimate nondiscriminatory purpose for terminating Rivera's employment.

 In the face of the defendants' legitimate nondiscriminatory purpose for firing him, Rivera fails to produce evidence that raises a genuine issue as to whether the reason was mere pretext for age discrimination. He offers evidence that his job performance was in fact satisfactory, that he had received performance bonuses every year while employed by the defendants, and that the report he failed to produce to Navarro was "nothing more that (sic) the informal annotations of measurements which could be employ (sic) to improve the company's performance and which eventually changed into an indispensable formal work plan." Plaintiffs' Statement at 29. While this evidence may raise an issue as to the business wisdom of firing Rivera, it is not probative of whether he was fired because of discriminatory animus. As the First Circuit explained, the "ADEA does not stop a company from discharging an employee for any reason (fair or unfair) or for no reason, so long as the decision to fire does not stem from the person's age." *Medina–Munoz v. R.J. Reynolds Tobacco Company*, 896 F.2d 5, 10 (1st Cir.1990), *citing Freeman v. Pack-*

*age Machinery Co.*, 865 F.2d 1331, 1341 (1st Cir.1988). Rivera cites his age at the time he was fired as evidence of discriminatory animus. Rivera's age at the time he was fired allows him to meet one element of the ADEA prima facie case, but it is not in and of itself evidence of the Defendants' motives for firing him. Rivera offers evidence that Mrs. Navarro tended to hire younger employees to work in the NCE Foods warehouse. Evidence of the Defendants' motives regarding other positions in NCE Foods is not probative of whether the Defendants' stated reasons for firing Rivera were pretextual, given Rivera's unique and supervisory position at NCE Foods as Warehouse Manager. Finally, Rivera offers evidence that Navarro said NCE Foods could afford two young employees with Velázquez's salary, and that after Velázquez was no longer employed by the defendants NCE Foods hired two younger employees. The evidence regarding Velázquez's employment is likewise not probative of motives for Rivera's termination, and in any event indicates that the defendants' were motivated by cost concerns, rather than by age animus. Because there is no genuine issue of material fact as to whether the defendants' stated reasons for firing Rivera were mere pretext for age discrimination, the defendants are entitled to summary judgment on Rivera's ADEA claim.

### 2. Velázquez's ADEA Claim

Velázquez's ADEA claim fares no better than Rivera's, because there is no genuine issue as to the second element of a prima facie case, whether the defendants subjected him to an adverse employment action.

 The Court will analyze this case in terms of whether Velázquez was constructively discharged from NCE Foods, because although NCE Foods eliminated Velázquez's position with the company, it

immediately offered Velázquez a different position. To prove constructive discharge under the ADEA a plaintiff must show that his working conditions were so difficult or unpleasant that a reasonable person in his shoes would have felt compelled to resign. *De La Vega v. San Juan Star,* 377 F.3d 111, 117 (1st Cir.2004), *Lee–Crespo v. Schering–Plough Del Caribe, Inc.,* 354 F.3d 34, 45 (1st Cir.2003). The First Circuit has emphasized, "It is not enough that the plaintiff suffered the ordinary slings and arrows that workers routinely encounter in a hard, cold world." *De La Vega,* 377 F.3d at 117. Thus Velázquez could only recover under the ADEA if the terms and conditions of the new position offered to him were so difficult or unpleasant that a reasonable person would have been compelled to not accept the new position.

The undisputed facts in this case shows that Velázquez was not constructively discharged. Navarro met with Velázquez and informed him that his position at NCE Foods had been eliminated and to offer a new position with NCE Foods as Warehouse Manager. The only differences between the new position and the one he had held were that he would no longer visit clients personally and he would no longer be entitled to a car allowance or a company car. At the new position Velázquez would continue to receive the same salary, bonuses, and medical insurance. The new position would not require the use of a car. Velázquez set forth no evidence which indicates that either the elimination of the car allowance and company car, or the change in his functions within NCE Foods amounted to working conditions so difficult or unpleasant that a reasonable person would be forced to resign, but simply alleges that Navarro's actual purpose when eliminating the car benefits was to get rid of Velázquez. Because there is no evidence that the terms of the new position

represented conditions sufficiently onerous to constitute constructive discharge, the defendants are entitled to summary judgment on Velázquez's ADEA claim.

**B. Law 80**

■ Puerto Rico Law 80 provides relief to employees who are terminated from employment "without good cause." P.R. Laws Ann. tit. 29 § 185a (2003). Section 185b of Law 80 gives examples of good cause for termination and further provides that a termination which is "made by the mere whim of the employer or without cause relative to the proper and normal operation of the establishment" is not a termination for good cause. P.R. Laws Ann. tit. 29 § 185b (2003). Courts have found good cause for termination exists where an employee violated an employer's internal procedures, *Vargas v. Royal Bank of Canada,* 604 F.Supp. 1036 (1985), and where an employee failed to follow rules and supervisory instructions, *Menzel v. Western Auto Supply Co.,* 662 F.Supp. 731 (1987). Law 80 does not invariably require repeated violations, particularly where an initial offense is so serious, or so reflects upon the employee's character, that the employer reasonably should not be expected to await further occurrences. *See González,* 304 F.3d at 75, *citing Delgado Zayas v. Hosp. Interamericano de Medicina Avanzada,* 137 D.P.R. 643, 650 (1994).

**1. Rivera's Law 80 Claim**

■ The undisputed facts show that the decision to terminate Rivera's employment was not made on a mere whim in violation of Law 80. Navarro terminated Rivera's employment only after exhausting other forms of discipline. She issued him written memoranda regarding his performance on three occasions prior to his termination, and sent him on vacation prior to his ter-

mination. The undisputed facts show good cause for the termination, including incidents where Rivera failed to follow Navarro's instructions, authorized delivery of frozen foods in unsuitable vehicles, and his remark at the June 25, 2003, meeting. Accordingly the defendants are entitled to summary judgment on Rivera's Law 80 claim.

### 2. Velázquez's Law 80 Claim

■ Law 30 defines "discharge" as "besides the employee's layoff, his suspension indefinitely or for a term over three months." P.R. Laws Ann. tit. 29 § 185d (2003). Velázquez was not terminated from employment because his position was eliminated and he was simultaneously offered another position, and because this action by the defendants did not amount to a constructive discharge. The defendants are entitled to summary judgment on Velázquez's Law 80 claim.

### C. Law 100

■ Law 100 is the Puerto Rico equivalent of the ADEA, but the federal and Puerto Rico statutes differ on the burden of proof required to show discrimination. *See, Cardona Jimenez v. Bancomerico de Puerto Rico,* 174 F.3d 36, 42 (1st Cir.1999); *see Alvarez–Fonseca v. Pepsi Cola of Puerto Rico Bottling Co.,* 152 F.3d 17, 27 (1st Cir.1998). The principal difference between the ADEA and Law 100 is the burdens of proof imposed on the employer and employee. *See, Cardona Jimenez,* 174 F.3d at 42. Law 100 establishes a rebuttable presumption that the employer has engaged in unlawful discrimination unless the employer can show that it had good cause to discharge the employee. P.R. Laws Ann. tit. 29 § 148 (2003). Once a plaintiff has alleged an unjustified dismissal and proves by a preponderance of the evidence that he was actually or con-

structively discharged, the burden then shifts to the employer to prove by a preponderance of the evidence that it had just cause to dismiss the employee. See, P.R. Laws Ann. tit. 29 § 148 (2003), *see, Cardona Jimenez,* 174 F.3d at 42. To determine what constitutes good cause in a Law 100 claim, a court looks to the definition of good cause in Law 80. *Baez Garcia v. Cooper Laboratories, Inc.,* 120 P.R. Dec. 145, 155. If the employer fails to show just cause, the Law 100 presumption of discrimination is triggered, and the burden of production and persuasion shifts from the employee, and the employer must prove by a preponderance of the evidence that the otherwise unjustified dismissal was not motivated by discriminatory animus. *Alvarez–Fonseca,* 152 F.3d at 28.

As discussed in the context of Rivera's Law 80 claim, there is no genuine issue as to whether the Defendants fired Rivera for just cause, and as discussed in the context of Rivera's ADEA claim, Rivera has produced no evidence to support his contention that the defendants' decision was motivated by age based animus. The defendants are therefore entitled to summary judgment on Rivera's Law 100 claim, and on Velázquez's Law 100 claim, because as discussed in the context of Velázquez's ADEA claim, Velázquez was not subjected to adverse employment action.

### D. FLSA

■ The Fair Labor Standards Act ("FLSA") requires employers to pay overtime to employees who work on an hourly basis. 29 U.S.C. § 201, et seq. If such an employee works more than forty hours per week the employer must pay the employee at a rate not less than one and a half times the regular rate for each hour in excess of the forty hours per week. 29 U.S.C. § 207. The FLSA excludes from the overtime requirements "any employee em-

ployed in a bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1). The FLSA does not define "executive, administrative or professional capacity," but expressly delegates that task to the Secretary of Labor. 29 U.S.C. § 213(a)(1). Although the Department of Labor regulations defining the term were revised in 2004 for the first time since 1975, the new regulations do not apply retroactively, *Kennedy v. Commonwealth Edison, Co.*, 410 F.3d 365, 369 (7th Cir.2005), so the Court will apply the definitions in the old regulations to this case. It is the employer's burden to establish that an employee is exempt from the FLSA's overtime requirement. *See, Corning Glass Works v. Brennan*, 417 U.S. 188, 196–97, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974). An exemption is to be determined by an employee's actual duties, and not by reference to his title. 29 C.F.R. § 541.201(b). The remedial nature of the FLSA requires that exemptions be construed narrowly. *Reich v. John Alden Life Insurance Co.*, 126 F.3d 1, 7 (1st Cir.1997).

### 1. Rivera's FLSA Claim

The Defendants argue that Rivera was an exempt executive employee. The old regulations provide both a short test and a long test for whether an employee is an exempt executive employee. 29 C.F.R. § 541.1 (2001). The short test applies to employees who earn a salary of at least $250 per week, and requires that the employee's primary duty (1) consist of the management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof, and (2) include the customary and regular direction of two or more employees. 29 C.F.R. § 541.1(f) (2001). The short test applies to Rivera's FLSA claim, because it is undisputed that immediately prior to his termination he earned a monthly salary of $3,200.

The uncontested facts show that Rivera meets the executive employee exemption. As Warehouse Manager Rivera was in charge of day to day operations of NCE Foods in Puerto Rico, and supervised six to nine employees. Rivera's own affidavit confirms that he was "in charge of the warehouse, purchase, sales, dispatch, reporting, and supervision of warehouse employees." No. 33. His affidavit states that he also performed manual tasks, including loading and unloading containers and trucks, receiving and organizing merchandise, receiving and processing notes and orders, purchasing unavailable supplies, cleaning the warehouse, visiting clients, delivering merchandise, changing the oil and filter of the trucks, and cleaning and maintaining the trucks. No. 33. However, concurrent performance of exempt and non-exempt work does not disqualify an employee from the executive exemption if the requirements are otherwise met. 29 C.F.R. § 541.106 (2001). Given that he alone was in charge of the day to day management of the NCE Foods warehouse, it is clear that his management duties constituted his "primary duty" while at NCE Foods. The defendants are therefore entitled to summary judgment on Rivera's FLSA claim.

### 2. Velázquez's FLSA Claim

The defendants argue that Velázquez was an exempt administrative employee. As with the executive employee definition the old regulations provide both a short test, 29 C.F.R. § 541.2(e)(2) (2001), and a long test, 29 C.F.R. § 541.2(a)-(e) (2001), for whether an employee is an administrative employee. The short test applies to employees who earn a salary of $250 or more per week, 29 C.F.R. § 541.2(e)(2) (2001), and requires that the employee's primary duty (1) consist of "office or non-manual work directly related to manage-

ment policies or general business operations of his employer or his employer's customers," 29 C.F.R. § 541.2(a)(1), and (2) include "work requiring the exercise of discretion and independent judgment." 29 C.F.R. § 541.2(e)(2) (2001). See, Reich, 126 F.3d at 8. The short test applies to Velázquez's FLSA claim, because it is undisputed that Velázquez earned a salary of $440.57 immediately prior to his decision to not accept the new position.

▆ The defendants' must be denied summary judgment on Velázquez's FLSA claim must be denied because there is a genuine issue as to whether Velázquez's primary duty at NCE Foods involved office or non-manual work directly related to management policies or general business operations. The regulations provide that work "directly related to management policies or general business operations" includes activities which are related to administrative operations as opposed to production, and which are "of substantial importance to the management or operation of the business." 29 C.F.R. § 541.205(a) (2001). It is clear from the uncontested facts that Velázquez performed some nonmanual administrative duties for NCE Foods. Whenever Rivera was not present, Velázquez would be the person in charge of the warehouse's operation, including the supervision of employees. However, a genuine issue exists as to whether Velázquez's administrative work was his "primary duty" at NCE Foods. The old regulations provide that "[i]n the ordinary case it may be taken as a good rule of thumb that primary duty means the major part, or over 50 percent, of the employee's time." 29 C.F.R. § 541.103 (2001). Velázquez's affidavit states that he also performed manual duties, such as unloading trailers, loading trucks, receiving orders, dispatching orders, taking orders over the phone, data

entry duties regarding the inventory system, substituting the drivers when they were absent, cleaning the warehouse and trucks, and changing the oil and filters of the trucks. No. 33. The affidavit further states that such manual duties represented ninety-five percent of his work time. No. 33. On these facts the Court holds a reasonable jury could find that Velázquez's administrative functions were not his primary duty at NCE Foods, and therefore the Defendants are not entitled to summary judgment on Velázquez's FLSA claim.

### E. Law 379

▆ Puerto Rico Law 379 requires employers to pay overtime compensation at a rate of two times regular pay for work in excess of eight hours per day and forty hours per week. P.R. Laws Ann. tit. 29 §§ 271, 274 (2003). Like the FLSA, Law 379 exempts executive and administrative employees from its overtime requirements, P.R. Laws Ann. tit. 29 § 288 (2003), and the relevant regulations which define administrative and executive employees covered by the exemption are substantially the same as the old regulations promulgated under the FLSA. Regulation No. 13, Article III, Fourth Revision, Commonwealth of Puerto Rico Minimum Wage Board (1990). The only relevant difference between the FLSA and Law 379 with respect to the executive and administrative exemptions is that under Law 379 the threshold salary for the administrative exemption short test is the salary threshold, $295 per week rather than $250 per week. Regulation No. 13, Article III(f), Fourth Revision, Commonwealth of Puerto Rico Minimum Wage Board (1990). It is appropriate for courts to look to the FLSA case law and regulations when interpreting the law 379 exemptions. *See, Pages–Cahue v. Iberia Lineas Aereas de Espana,* 82 F.3d 533, 542 (1st Cir.1996), *see Rodríguez v.*

*Concreto Mixto, Inc.,* 98 P.R.R. 568, 575–76, 1970 WL 23837 (P.R.1970).

With respect to the plaintiffs' Law 379 claims the Court reaches the same conclusions it did on the plaintiffs' FLSA claims, and holds that the defendants are entitled to summary judgment on Rivera's Law 379 claim, but not on Velázquez's claim.

## V. CONCLUSION

The Court **GRANTS IN PART AND DENIES IN PART** the defendants' motion for summary judgment. Judgment will be entered dismissing with prejudice both of the plaintiffs' ADEA, Law 80, and Law 100 claims, and Rivera's FLSA and Law 379 claims. Velázquez's FLSA and Law 379 claims remain before the Court.

**IT IS SO ORDERED.**