Socorro **RIVERA ROSA**, Plaintiff,

v.

**CITIBANK, N.A., Defendants.**

Civil No. 06–2234(FAB).

United States District Court,
D. Puerto Rico.

July 22, 2008.

[black redaction block]

Celina Romany–Siaca, Celina Romany Law Office, San Juan, PR, for Plaintiff.

Ada Nurie Pagan–Isona, Juan J. Casillas–Ayala, Fiddler, Gonzalez & Rodriguez, San Juan, PR, for Defendants.

## OPINION AND ORDER

BESOSA, District Judge.

On October 2, 2006, Ms. Socorro Rivera–Rosa filed a complaint in the Commonwealth courts against Citibank, N.A., alleging that she was terminated from her employment without just cause in violation of Puerto Rico Law 80, P.R. Laws Ann. tit. 29 §§ 185a–185m. She also alleged that the investigation that led to her termination violated her constitutional rights secured by the Constitution of the Commonwealth of Puerto Rico. P.R. Const., Art. II, §§ 1, 8. On December 8, 2006, Citibank removed the case to this Court alleging diversity jurisdiction. 28 U.S.C. § 1332 (Docket No. 1)

On April 14, 2008, Citibank moved for summary judgment alleging that Ms. Rivera–Rosa's dismissal was justified because she had violated Citibank's Conflict of Interest Policy and that Citibank's investigation into her wrongdoing did not exceed constitutional boundaries. (Docket No. 48) On May 15, 2008, plaintiff opposed Citibank's request. (Docket No. 56) Citibank filed a reply. (Docket No. 62) For the reasons discussed below, the Court **GRANTS IN PART AND DENIES IN PART** defendant Citibank's request. Ms. Rivera–Rosa's constitutional claim is **DISMISSED;** her claim pursuant to Law 80 is **GRANTED.**[1]

## I. FACTUAL BACKGROUND

The following facts are uncontested:

Citibank N.A. in Puerto Rico is a fully-owned branch of Citibank N.A. in New York, which is a subsidiary of Citicorp Holdings, Inc., a subsidiary of Citigroup, Inc. (Docket No. 48, Citibank's Statement of Uncontested Material Facts "CSUMF" ¶ 1.) Citibank provides banking and financial services to businesses and individual consumers. (CSUMF ¶ 2.) As a depository institution, Citibank has to comply with the Community Reinvestment Act ("CRA"), 12 U.S.C. § 2901, et seq. The CRA requires that financial institutions which accept deposits offer equal access to lending, services and investment to the communities in which they operate. The CRA's intended purpose is to encourage financial institutions to help meet the credit needs of those communities. (CSUMF ¶ 3) Citibank implements the CRA by providing financial education to low-income sectors of the population; by providing access to loans and other forms of financing to housing projects through its Community Development Division; and by distributing grants from the Citigroup Foundation ("CF"). (CSUMF ¶ 4)[2]

In 1997, Ms. Rivera–Rosa was employed by Citibank in Puerto Rico as the CRA Director. (CSUMF ¶ 17) Her supervisors were Carlos Davila, Region Manager for

---

1. On June 27, 2008, the parties filed a "Joint Motion in Compliance and Stipulation" stating that Mrs. Rivera Rosa would be entitled to a severance pay ("mesada") of $76,061.53, should she prevail in her Law 80 claim. (Docket No. 95)

2. Although Ms. Rivera–Rosa qualified CSUMF # 4, she only explained in more detail how Citibank implemented the CRA. She did not, however, create a disputable issue of fact as to Citibank's statement. Thus, this fact remains uncontested.

Citibank North America, and Denise Durham–Williams, National Community Affairs Director for Citibank N.A., who worked out of Citibank's headquarters in New York. (CSUMF ¶ 18; Plaintiff's opposing statement ("POS") ¶ 18)

Ms. Rivera–Rosa's job description listed her duties as CRA Director as follows: a) to identify risks and opportunities while meeting CRA goals; b) to assess credit needs in the community and available products in the market in order to advise business units on needs and opportunities for the development of new products and/or the improvement of existing ones; c) to explore business and/or service opportunities to establish partnerships with government agencies, non-profit organizations and other banks to extend guarantees to enhance credit products and limit risks; d) to participate in the creation of intermediaries and/or other mechanisms to facilitate innovative investment opportunities; e) to identify business opportunities for CD Lending and Social Investments; f) to evaluate grant applications, manage CD grant programs and monitor progress of grantees; g) to represent Citibank in committees, boards and other CRA events; and h) to advise the CCO and senior team on the impact of business decisions on the community. (CSUMF ¶ 19)

To implement the financial education aspect of its mission, the CRA office would design educational programs and training projects for different community-based and non-profit organizations. As the CRA Director, Ms. Rivera–Rosa identified organizations that were involved with economic development and housing and worked with them to build alliances between them and Citibank. She would then design educational and training projects for those community-based organizations. (CSUMF ¶¶ 5 and 20)

The financing aspect of the CRA program was conducted by Citibank's Community Development Division ("CCD"). Ms. Rivera–Rosa only evaluated the projects' compliance with CRA. She was not responsible for evaluating the projects for financing. (CSUMF ¶ 24; POS ¶ 24; Citibank's Reply Statement ¶ 24)

The third aspect of the CRA program, the distribution of grants, was conducted through the Citigroup Foundation ("CF") pursuant to the CF's programmatic guidelines. The CF makes grants to enhance economic opportunities for under-served individuals and families in the communities. (CSUMF ¶ 7) The grants' final approval is done by the CF board. A local grant budget for which the local CRA Director is responsible also exists. (CSUMF ¶ 5)

To insure that non-profit organizations complied with this grant distribution aspect, Ms. Rivera–Rosa made sure that non-profit organizations submitted complete grant applications and that the CF's guidelines were met. (CSUMF ¶¶ 9, 13 and 29; POS ¶¶ 9, 13 and 29) Once the organizations were identified and invited to apply for a grant by the CF, they submitted proposals to the CF through Ms. Rivera–Rosa. She then evaluated the proposals, referred them to the appropriate Citibank business representative, offered assistance in the processing of the grant and answered any questions the CF had about a particular grant submission. The CF had the final authority to approve the grant. *Id.;* (CSUMF ¶¶ 14, 31–32; Citibank's reply statement, p. 9) Ms. Rivera–Rosa recommended approval or disapproval before the CF made the final decision on whether to give the grant to the organization. (CSUMF ¶ 32) The majority of the proposals submitted by Ms. Rivera–Rosa on behalf of the organizations were approved. It is her opinion that the CF

approved the proposals she submitted because they trusted her judgment and expertise in the area. (CSUMF ¶ 34)

In addition to the grants given by the CF, funds existed for local grants to be distributed by the local CRA office. As the CRA Director, Ms. Rivera–Rosa managed the local grant budget. (CSUMF ¶ 35) She developed a procedure for organizations to receive local funds. (CSUMF ¶ 36) She could authorize the final approval for a grant under $5,000. (CSUMF ¶ 37) For local grants over $5,000, Ms. Rivera–Rosa would recommend approval and a higher official would approve the grants and authorize their disbursement. (CSUMF ¶ 38)

Because Ms. Rivera–Rosa's knowledge of the CRA was very thorough, Mr. Davila followed her recommendations when deciding with which organizations to do business. (CSUMF ¶ 22) Ms. Rivera–Rosa, however, did not have final authority to distribute funds and/or approve financing. (CSUMF ¶ 22, Citibank's Reply Statement, ¶ 23)

As CRA Director, Ms. Rivera–Rosa worked with about 40 organizations. One of those organizations was the *Comite Ecumenico para el Desarrollo Economico Comunitario* (CEDECO). (CSUMF ¶ 42) CEDECO is a non-profit community organization based in Mayagüez, Puerto Rico. It has received grants from the CF and had a revolving line of credit of $7,300,000 for the construction of over 100 housing units for the low-income sector in Mayagüez. (CSUMF ¶ 44) In order to receive a grant from the CF, CEDECO had to submit a proposal which included an overview of the organization, a summary of the project, the certificate of incorporation, the project budget, audited financial statements, and other information not pertinent here. (CSUMF ¶¶ 12, 45)

Because the financial status of organizations was an important factor in the review of the proposals, the organizations had to include audited financial statements with their proposals. Citibank's policy required audited statements if the community organizations were to receive funds in order to distribute grants. Ms. Rivera–Rosa did not participate or had any knowledge of the factors CF took into consideration before approving or denying a grant. (CSUMF ¶¶ 11–12; POS ¶ 11 and Citibank's Reply Statement, p. 8)[3] Ms. Rivera–Rosa received CEDECO's proposal, however, and made a "preliminary" recommendation for its approval to the CF. (CSUMF ¶ 46) The final authority to approve the grants was the CF. The audited financial statement submitted by CEDECO (as of December 31, 2002) was prepared by Mr. Alvira–Ruiz, who had been Ms. Rivera–Rosa's sentimental partner since 1998. (CSUMF ¶ 47; Docket No. 48, Exh. 6) Mr. Alvira is a Certified Public Accountant who provided services for non-profit organizations, including auditing and preparing applications to obtain federal tax-exempt status. (CSUMF ¶¶ 48–49) Mr. Alvira has worked with organizations that received funds (loans and/or grants) from Citibank. (CSUMF ¶ 50; Docket No. 48, Exh. 10)

He also prepared and signed the audited financial statements for the following organizations that received funds from Ci-

---

**3.** Ms. Rivera–Rosa qualified statement number 22 by asserting that the financial statements are not included in the list provided by Citigroup Foundation Guidelines' areas of Focus and Funding Limitations. The documents in support of her assertion, however, do not refer to the procedural requirements that a proposal must fulfill in order to receive a grant, but rather describe the types of programs and organizations eligible for grants. *See,* Docket No. 54, Exh. 7, p. 3.

tibank: Corporacion de Apoyo a Programas Educativos y Comunitarios (CAPEDCOM), CEDECO, Ceiba Housing and Economic Development Corporation, Ponce Neighborhood Housing Services Corporation (Ponce NHS), Comite Caborrojeños Pro Salud y Ambiente, Asociacion de Corporaciones Especiales Propiedad de Trabajadores (ACEPT), Centro de Adiestramiento y Trabajo para Personas con Impedimentos (CATPI), San Juan Neighborhood Housing Services Corporation (San Juan NHS), and Comerciantes Unidos para el Desarrollo Comunitario de Camuy. (CSUMF ¶ 51; Docket No. 48, Exh. 14)

Mr. Alvira had worked for CEDECO since 2002, first as an auditor and later as a consultant. The last audit he performed for CEDECO was in 2003; he was then asked to become a consultant for a project financed by Citibank in Mayagüez. As a consultant for CEDECO, he attended weekly meetings about the project and provided advice about its financial aspect (pricing and budget). (CSUMF ¶ 52) He does not know from which of the different sources of funding of the community organizations he was paid. He only knows that the community organizations paid him. (CSUMF ¶ 54)

Plaintiff's relationship with Mr. Alvira began in 1998; they lived together since 2005 but each one retained his and her own house. (CSUMF ¶¶ 61–62; POS ¶¶ 61–62) In January 2007, Mr. Alvira moved into Ms. Rivera–Rosa's house completely, and sold his house. Ms. Rivera–Rosa and Mr. Alvira attended Citibank activities together, particularly Christmas

parties. (CSUMF ¶ 64) Although he went to Citibank's social activities with Ms. Rivera–Rosa, he never went with her to activities where she was with the community groups. (CSUMF ¶ 55) Ms. Rivera–Rosa never informed or disclosed to her supervisors at Citibank that Mr. Alvira worked as an independent auditor for community organizations which received funds from Citibank. (CSUMF ¶ 65) Some of Ms. Rivera–Rosa's supervisors knew that she had a relationship with Mr. Alvira but did not know that he was involved with these community organizations. (CSUMF ¶¶ 66–72; Docket No. 48; Exh. 1, pp. 72–73) Mr. Alvira and Ms. Rivera–Rosa did not talk about their work among themselves.

In February 2006, CEDECO defaulted on the loan with Citibank. Mr. Alvira then became the liaison person between CEDECO and Citibank in order to attempt to reestablish the financing. (CSUMF ¶¶ 56–60)

## A.  CITIBANK'S INVESTIGATION

Several months before the investigation that led to Ms. Rivera–Rosa's dismissal, the Federal Bureau of Investigation ("FBI") searched CEDECO's offices. After the search, Citibank was concerned about whether it could have some exposure because of its long-standing relationship and business with CEDECO and feared that such exposure could "extend to the funds that [it] provided" or "perhaps [to] any employees of Citibank that could have been involved in misconduct or wrong acts." (CSUMF ¶ 74; Docket No. 48, Exh. 18, p. 41)[4] 75. In order to ascertain

---

**4.** Although Ms. Rivera–Rosa denied or qualified statements nos. 74 to 80 because "discovery requested concerning the investigation and his recruitment were denied under the attorney-client privilege," it is clear that she waived any objections to Citibank's assertion of the privilege. As correctly stated by Citibank, after her Motion to Compel was denied without prejudice on December 11, 2007 by the Court (Docket No. 41), she never brought the matter to this Court's attention. Further, Ms. Rivera–Rosa qualified many statements without supporting her denials or qualifications "by a record citation" as required by

the extent, if any, of Citibank's exposure, Mr. Bernard McCrossan, Senior Investigator for Citigroup Security and Investigative Services, met with the FBI agents during a visit to Puerto Rico.[5] The FBI agents never told Mr. McCrossan that they were investigating Mr. Alvira, although they did mention that they were familiar with his name because he was the auditor in the CEDECO financial statements they reviewed. (CSUMF ¶ 75; Docket No. 48, Exh. 18, pp. 43, 46–47) The FBI agents told Mr. McCrossan that they had no interest in any Citibank employee and that no employees of Citibank were subjects of their investigation. (CSUMF ¶ 76; Docket No. 48, Exh. 18, p. 46)

Mr. McCrossan was later assigned to perform an investigation regarding Ms. Rivera–Rosa's apparent conflict of interest. (CSUMF ¶ 78; Docket No. 18, p. 23) During the investigation, several employees of the bank were interviewed and company documents were reviewed. (CSUMF ¶¶ 81–83) Mr. McCrossan also conducted searches within the bank's files, databases and Internet. (CSUMF ¶ 81) Ms. Rivera–Rosa was also interviewed as part of Mr. McCrossan's investigation.

### 1. *MS. RIVERA ROSA'S INTERVIEW*

Ms. Rivera–Rosa was summoned for a meeting on May 8, 2006 with Mr. McCrossan and the Human Resources Director, Maria Dume. Ms. Rivera–Rosa did not know the purpose of the meeting. (CSUMF ¶ 95) The meeting was to interview her. As part of the interview, Mr. McCrossan asked Ms. Rivera–Rosa about Citibank procedures, the CRA department, her responsibilities as the CRA Director and about CEDECO. (CSUMF ¶ 96) Mr. McCrossan showed her an audit report from CEDECO prepared by Mr. Alvira and asked her about the integrity of financial statements. Ms. Rivera–Rosa had nothing to do, however, with the preparation of the financial statements. (CSUMF ¶ 97)

Ms. Rivera–Rosa was later asked about her relationship with Mr. Alvira. She was specifically asked if she knew Mr. Alvira and how she came to know him. Ms. Rivera–Rosa answered that Mr. Alvira was a friend. Mr. McCrossan then asked her if Mr. Alvira was a "close friend" and Ms. Rivera–Rosa answered yes. (CSUMF ¶ 98) She was also asked by Dume why she had not informed Citibank about her relationship with Mr. Alvira. (CSUMF ¶ 99)

Ms. Rivera–Rosa was also questioned about the job she had in the United States before she joined Citibank. For instance, she was questioned about an organization named Ceiba[6] (which she helped found),

Local Rule 56(c). Therefore, pursuant to Local Rule 56(e) "[f]acts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted." *See also CMI Capital Market Investment, LLC v. Gonzalez–Toro,* 520 F.3d 58, 62–63 (1st Cir.2008).

**5.** Citigroup Security and Investigative Services *is a unit within Citigroup that provides professional investigative services to the corporation to protect its assets, integrity and reputation.* As a Senior Investigator, Mr. McCrossan investigates cases that pertain to financial crimes against Citibank and those related to employee misconduct. About 50 percent of his cases deal with employee misconduct, including cases of employees who have stolen money or property and employees who have incurred in conflicts of interest. (Docket No. 48, Exh. 18, pp. 7–8 and 15–17)

**6.** Ms. Rivera–Rosa's curriculum vitae states that she was the Co–Founder of Ceiba, an Association of Latino Community Economic Development Corporation in Philadelphia, PA. Her curriculum vitae is part of her personnel file. (CSUMF ¶ 101; Docket No. 48, Exh. 20)

and whether Ceiba had anything to do with an organization in Puerto Rico with the same name. Ms. Rivera–Rosa then realized she was the target of the investigation. (CSUMF ¶ 100)

She was also asked about her relationship with other organizations and about why money was being transferred to CEDECO through other community organizations. (CSUMF ¶ 103) She was asked whether she thought that being seen with Mr. Alvira would lead the organizations to think that she would give them money because they were being audited by Mr. Alvira. (CSUMF ¶ 104)

Ms. Rivera–Rosa told Mr. McCrossan that she never thought about the possibility that her relationship with Mr. Alvira was a conflict of interest, but that based upon some things that were going on with CEDECO, that she was thinking about going to Mr. Davila to let him know that there could be an issue. (CSUMF ¶ 105)

Ms. Rivera–Rosa claims that the interview was "accusing" [sic], "aggressive", "intimidating" and "humiliating". She admits, however, that there was no foul language used and that neither Mr. McCrossan nor Ms. Dume made any demeaning comments to her. Ms. Rivera–Rosa claims that she was bothered by the line of questioning, the accusatory and aggressive tone used by Mr. McCrossan and Ms. Dume during their questioning, and their intentions. (CSUMF ¶ 107; Docket No. 48, Exh. 1, pp. 105, 107–108)

Ms. Rivera–Rosa was asked to write a statement immediately after the interview "... because that was precisely the day before it was announced the general strike [sic] ..." in Puerto Rico. (CSUMF ¶ 108; Docket No. 48, Exh. 1, p. 71)

The interview lasted about three hours, including the time it took Ms. Rivera–Rosa to write her statement. (CSUMF ¶ 109; Docket No. 48, Exh. 1, pp. 98 and 118)

In her written statement, Ms. Rivera–Rosa expressed that: "[a]lthough I did not see any conflict of interest on [sic] Mr. Alvira being a consultant to community organizations that are receiving funds from Citibank/Citigroup Foundation or being a consultant to CEDECO, I do recognize now that I should have informed my supervisors of our relationship." (CSUMF ¶ 110; Docket No. 48, Exh. 21)

Ms. Rivera–Rosa has stated that the content of her statement is her version and interpretation of the facts. She further has indicated that there was nothing false in that statement. (CSUMF ¶ 111; Docket No. 48, Exh. 1, p. 120)

On May 10, 2006, Ms. Rivera–Rosa was suspended for ten days and was informed to be under investigation because of conflict of interest. (CSUMF ¶ 112) The following week, Ms. Durham–Williams called Ms. Rivera–Rosa and asked her to visit the Human Resources office. She met with Ms. Durham–Williams and Ms. Luisana Rincon. (CSUMF ¶ 113; Docket No. 48, Exh. 1, p. 125) Mr. Davila also participated in the meeting via telephone. Ms. Rivera–Rosa was informed that she was being terminated because the investigation revealed that her relationship with Mr. Alvira constituted a conflict of interest and violated Citibank's Code of Conduct. (CSUMF ¶ 114; Docket No. 48, Exh. 1, p. 26 and Exh. 8, pp. 68–69) Citibank's management position was that a conflict of interest existed between Ms. Rivera–Rosa's personal relationship with Mr. Alvira and her work as a CRA Director because Mr. Alvira was the auditor on financial statements on grants she recommended to the CF. (CSUMF ¶ 129; *see also* CSUMF ¶¶ 14, 31–32; Citibank's reply statement, p. 9)

Citibank's Code of Conduct and Ethical Policies provides the following:

> We must avoid circumstances in which our personal interests conflict, or may appear to conflict, with the interests of Citicorp or its customers. Situations that may lead to actual or apparent conflict include (but are not limited to):
>
> - Participating in decisions to do business with organizations in which you or a close family member has an interest or from which personal benefit may accrue. CSUMF, ¶ 115, Exh. 22, p. 8 [7]

The Code of Conduct warns that "employees who do not comply with the Code of Conduct and Ethical Policies may be subject to disciplinary action, termination of employment and/or legal proceedings." (CSUMF ¶ 116; Docket No. 48, Exh. 22, p. 6)

In early 2005, Mr. Charles Prince, CEO of Citigroup, announced the adoption of a "Five–Point Ethics Plan," as part of a strategy to become the most respected global financial services company. The Five–Point Plan was an initiative to refocus the organization in terms of conducting business at the highest level of integrity, ethics and ethical standards. (CSUMF ¶ 118) The Plan's initiatives included expanded training, improved communications, and strengthened controls. The Five–Point Plan responded to several allegations and investigations, particularly in Japan and England, which had hurt Citigroup's reputation in the corporate world. (CSUMF ¶ 117) All employees were trained in the Five–Point Plan and its message was reemphasized at staff meetings. (CSUMF ¶¶ 119–120)

When she was recruited by Citibank, Ms. Rivera–Rosa received and read the company policies, the Code of Conduct and Ethical Policies and the Employee Manual. (CSUMF ¶ 121; Docket No. 48, Exh. 1, pp. 13–14; Exh. 24)

Citigroup's Practical Guide of Compliance states that "Citibank employees must avoid any conflict and even the appearance of conflict between his [sic] own personal, social, financial, political interests and the interests of Citibank/Citigroup, its subsidiaries and its clients." (CSUMF ¶ 122; Docket No. 48, Exh. 25)

Ms. Rivera–Rosa admitted that it is Citibank's policy that situations of apparent conflict need to be informed so that the appropriate persons could determine whether in fact there was a conflict. (CSUMF ¶ 123)

Under Mr. Davila's tenure, there had been another situation in which a high officer of the Bank was involved in a conflict of interest. Mr. Lidio Soriano was the head of the Mortgage Group who had a sentimental relationship with a subordinate while he was married. Mr. Soriano was first given a first verbal warning and was later asked to resign without entitlement to any benefits. (CSUMF ¶ 124; POS ¶ 124; Citibank's Reply Statement ¶ 124, p. 44)

Mr. Lorenzo Velez, who was Ms. Rivera–Rosa's peer and knew of Ms. Rivera–Rosa's situation, was given a verbal warning for failing to disclose her situation immediately. (CSUMF ¶ 135)

Her subordinates, Ms. Maria Eugenia Pagan and Ms. Nancy Zayas, who also knew about Mr. Alvira's role with the community organizations and did not inform

---

**7.** Although Ms. Rivera–Rosa agreed that this is the correct citation of the Code of Conduct, she qualified the statement alleging that there are issues as to what constitutes a "family member" but she does not state what those alleged issues are. Further, plaintiff claims that there is no conflict of interest for several reasons. (POS ¶ 115; Docket No. 54, p. 30)

Citibank about it, received verbal warnings. (CSUMF ¶ 136) Ms. Pagan was not considered to take over Ms. Rivera–Rosa's duties because of her failure to disclose this situation sooner. (CSUMF ¶ 137)

## B. PLAINTIFF'S ADDITIONAL STATEMENTS[8]

Mr. Davila, Ms. Rivera–Rosa's boss in Puerto Rico, was involved in a billboard business for which Citibank assigned a budget. (Docket No. 54, ¶ 3)

Mr. Davila testified during his deposition that he knew that Mr. Felix Vega, the Treasurer, had a sentimental relationship with a subordinate and that he still worked at Citibank at the time of his deposition. (Docket No. 54, ¶ 4) He further testified that he did not know if Mr. Vega had been reprimanded or not. (Docket No. 54, Exh. 4, p. 261)

Mr. Lidio Soriano, the head of the Mortgage Department, had a sentimental relationship with a subordinate. Mr. Soriano was first given a verbal warning and was later asked to resign. (Docket No. 54, ¶ 5; Citibank's opposition, ¶ 5)

Citibank's Human Resources Department did not provide any expert guidance from its perspective to the investigation. It deferred to the judgment of the investigators as to how to conduct the investigation. (Docket No. 54, ¶ 19) In fact, there is no bank policy giving Human Resources a role monitoring the procedures of an internal investigation. (Docket No. 54, ¶ 20)

According to Human Resources Officer Maria Dume, there were no attenuating factors considered before Ms. Rivera–Rosa was terminated. (Docket No. 54, ¶ 23)

Citibank's Employment Policy Manual provides that "the extent of any disciplinary action to be taken by the company for violations of the rules and policies will depend on the severity of the situation that brings about that action." (Docket No. 54, ¶ 24, Exh. 14) It further defines major violations as:

\* \* \*

"acts which seriously threaten the operation of the business or the safety and well-being of employees or others which cannot be tolerated in any work environment. Disciplinary action should be taken, and employees may be suspended without pay while the Bank investigates the situation. Depending on the circumstances, it may result in reinstatement or it may require discharge, even if it is the first offense." (Docket No. 54, Exh. 14, p. 5)

The Manual also includes examples of major violations, among them: insubordination; making false declarations in the employment application, making false, malicious or harmful declarations or manifestations about the Bank, clients or employees; sabotage; fraud, fund malversation and conducting any business conflicting with the Bank's interests, such as lending money and charging interest, approving loans, etc. to obtain personal benefit. (Docket No. 54, Exh. 14 and Docket No. 58, Exh. 8)

## II. SUMMARY JUDGMENT STANDARD

The court's discretion to grant summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure. Rule 56 states, in pertinent part, that the court

---

**8.** The Court will only consider those statements adequately supported by Ms. Rivera–Rosa inasmuch as "... [m]ere allegations, or conjecture unsupported in the record, are in-sufficient to raise a genuine issue of material fact." *August v. Offices Unlimited, Inc.,* 981 F.2d 576, 580 (1st Cir.1992).

may grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c); *See also, Santiago–Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 52. (1st Cir.2000); *Morales, et al. v. St. Luke's Episcopal Hospital, et al.*, 328 F.Supp.2d 192, 195–196 (D.P.R.2004). The party moving for summary judgment bears the burden of showing the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Once a properly supported motion for summary judgment has been presented, the opposing party has the burden of demonstrating that a trial-worthy issue exists that would warrant the court's denial of the motion for summary judgment. For issues where the opposing party bears the ultimate burden of proof, that party cannot merely rely on the absence of competent evidence, but must affirmatively point to specific facts that demonstrate the existence of an authentic dispute. *See Suarez v. Pueblo Int'l, Inc.*, 229 F.3d 49 (1st Cir. 2000).

■ In order for a factual controversy to prevent summary judgment, the contested facts must be "material" and the dispute must be "genuine". "Material" means that a contested fact has the potential to change the outcome of the suit under governing law. The issue is "genuine" when a reasonable jury could return a verdict for the nonmoving party based on the evidence. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). It is necessary that "a party opposing summary judgment must present definite, competent evidence to rebut the motion." *Maldona-*

*do–Denis v. Castillo–Rodriguez*, 23 F.3d 576, 581 (1st Cir.1994).

■ In making this assessment, the court "must view the entire record in the light most hospitable to the party opposing summary judgment, indulging in all reasonable inferences in that party's favor." *Griggs–Ryan v. Smith*, 904 F.2d 112, 115 (1st Cir.1990). "Mere allegations, or conjecture unsupported in the record, are insufficient to raise a genuine issue of material fact". *August v. Offices Unlimited, Inc.*, 981 F.2d 576, 580 (1st Cir.1992). The court may safely ignore, however, "conclusory allegations, improbable inferences, and unsupported speculation." *Medina–Muñoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990).

**A. PUERTO RICO LAW 80—MS. RIVERA–ROSA'S TERMINATION**

■ Puerto Rico Law 80 prohibits dismissal of employees without just cause. *Hoyos v. Telecorp Communications, Inc.*, 488 F.3d 1, 6 (1st Cir.2007); *Alvarez–Fonseca v. Pepsi Cola of P.R. Bottling, Co.*, 152 F.3d 17, 28 (1st Cir.1998). Under Law 80, once an employee proves that he or she was discharged and alleges that his dismissal was unjustified, his or her employer must establish by a **preponderance of the evidence** that the discharge was for good cause. Good cause for dismissal is "related to the proper and normal operation of the establishment." *Id.* (Internal citations omitted); *see also*, P.R. Laws Ann. tit. 29 § 185b; *Rivera Torres v. Pan Pepin, Inc.*, 161 D.P.R. 681, 688–690 (2004).

■ Section 2 of Law 80 provides a non-exhaustive list of circumstances that constitute just cause for termination. Among others, these circumstances include: a) that the worker indulges in a

**pattern** of improper o disorderly conduct; b) the attitude of the employee in not performing his work in an efficient manner, or doing it belatedly and negligently or in violation of the standards of quality of the product produced or handled by the establishment; and c) the employee's **repeated** violations of the reasonable rules and regulations established for the operation of the entity, provided a written copy of the rules and regulations has been opportunely furnished to the employee. P.R. Laws Ann. tit. 29 § 185b(a)-(c). (Emphasis added)

■ For a violation of rules to constitute just cause for discharge, the employer must show that the rules were reasonable, that the employee was provided with a written copy of the rules and that employee violated the rules **repeatedly**. *Rivera Aguila v. K–Mart de Puerto Rico,* 123 D.P.R. 599 (1989) (emphasis added)

■ Law 80 does not favor the employee's termination as punishment for a first violation. Although it generally refers to multiple episodes of misconduct as constituting good cause, however, it "... does not invariably require repeated violations, particularly where an initial offense is so serious, or so reflects upon the employee's character, that the employer reasonably should not be expected to await further occurrences." *Hoyos,* 488 F.3d at 6 (*quoting Gonzalez v. El Dia, Inc.,* 304 F.3d 63, 75 (1st Cir.2002); *Delgado Zayas v. Hosp. Interamericano de Medicina Avanzada,* 137 D.P.R. 643, 650, 1994 WL 908890 (1994)(in order to discharge an employee, on a first offense, the offense must be of such severe magnitude that it reveals an attitude or character, so threatening to the peace and order of the business, that it would make it improper to wait for a second occurrence before an employee is discharged)); *Secretario del Trabajo v. I.T.T.,* 8 P.R. Offic. Trans. 564 (1979) (Provi-

sions establishing discharge as punishment for first and only violation on employee who made false statement or fraudulent declaration in application for employment or company records are null and void. Such provisions do not meet norms of reasonability of subsection (e) of this section.)

■ Whether a first offense is so serious to dictate dismissal must be decided on a case-by-case basis, evaluating the facts and circumstances of each case. The analysis of what constitutes a serious violation mandating dismissal must be made "in the most restrictive way" because the imposition of the ultimate workplace penalty (dismissal) after a first offense is not supported by Law 80. Alberto Acevedo–Colom, *Legislacion Protectora del Trabajo Comentada* 139 (7ma ed.2001); Guia Revisada para la Aplicacion de la Ley Num. 80, pp. 32–34.

### 1. CITIBANK'S MOTION FOR SUMMARY JUDGMENT

#### a. *Ms. Rivera–Rosa's dismissal*

Citibank has claimed that its decision to terminate Ms. Rivera–Rosa was not capriciously made. Rather, it alleges that the uncontested facts show that Ms. Rivera–Rosa's dismissal was justified because she violated Citibank's rules and regulations regarding conflict of interest by failing to disclose her relationship with Mr. Alvira.

Ms. Rivera–Rosa, in turn, alleges that Citibank's decision to terminate "a top executive with an impeccable professional record" for her "first violation" is not sufficient to overcome Law 80's presumption of unjustified termination. (Docket No. 56) Although she acknowledges that she did not inform her supervisors that her companion was the auditor of entities that received monies from the bank, she claims the absence of a conflict of interest because Mr. Alvira was not an employee of

the community organizations, but an independent auditor; the proposals for the grants were approved by the CF; her participation in the approval/disapproval of the grants was limited to the verification of the organization's compliance with the CRA; and because the independent auditors were hired and paid by the community organizations, not the bank. (Docker No. 54, pp. 30–31)

Based on its investigation, Citibank concluded that Ms. Rivera–Rosa violated the Code of Conduct and that there was a conflict of interest between her personal relationship with Mr. Alvira and her work in community relations because he was the auditor of financial statements on grants Ms. Rivera–Rosa approved or recommended to the CF.

█ Even if this court were to assume that Ms. Rivera–Rosa's failure to inform her supervisors of her relationship with Mr. Alvira violated Citibank's Code of Conduct (at least its "apparent conflict" prohibition), Citibank has failed to prove, by a preponderance of the evidence, that Ms. Rivera–Rosa's dismissal was warranted.

Although improper, Ms. Rivera–Rosa's failure to divulge her relationship with Mr. Alvira, by itself, does not constitute the type of conduct that reveals an attitude or character so threatening to the peace and order of the business that it would make it improper to wait for a second occurrence for discharge. Moreover, the uncontested facts in this case show: that this was Ms. Rivera–Rosa's first violation of Citibank's rules; that the underwriting, approval, signing authority and disbursement of funds (other than the local grants of less than $5,000) were not Ms. Rivera–Rosa's responsibility; and that she was not responsible for the evaluation, distribution and/or approval of the projects for financing. Furthermore, the final authority to approve the grants was the CF and the financing aspect of the CRA program was conducted by CCD, not by Ms. Rivera–Rosa. The fact that her recommendations to the CF were followed "the majority of the time" or that her supervisor (Mr. Davila) followed her recommendations does not alter this conclusion. If that were to be construed as if Ms. Rivera–Rosa's recommendations were decisive, as Citibank suggests, the CF's role in this process would either be superfluous and unnecessary, or nothing more than a "rubber stamp" of Ms. Rivera–Rosa's recommendation. The uncontested facts in this case prove quite the *opposite*; regardless of the level of deference given to Ms. Rivera–Rosa's criteria by both the CF and Mr. Davila, she did not have the final word in the approval or disapproval of a grant. Thus, after a careful evaluation of the uncontested facts in this case and the case law previously analyzed, the court holds that Ms. Rivera–Rosa's failure to reveal her relationship with Mr. Alvira, although improper, did not entail the ultimate workplace penalty of dismissal. Therefore Citibank failed to show a justification for Ms. Rivera–Rosa's dismissal.[9]

### b. *Ms. Rivera–Rosa's constitutional claim*

Citibank also moved to dismiss Ms. Rivera–Rosa's constitutional claim alleging that the uncontested facts show that the investigation was reasonable, with a legiti-

---

**9.** Finally, Citibank invites this court to measure Ms. Rivera–Rosa's incident within the time frame when the Bank *globally* enhanced its goal of achieving the utmost ethical standards by making its top priority the avoidance of even the appearance of a conflict of interest. Citibank seems to ignore, however, that its standards, global or not, must conform with Puerto Rico Law 80, which prohibits dismissal of employees without just cause.

mate purpose and did not exceed constitutional boundaries.

■ The Puerto Rico Supreme Court has established an exception to the exclusive remedy provided by Law 80 for termination of employment predicated on grounds which impinge on an employee's constitutional rights. In *Arroyo v. Rattan Specialties, Inc.,* 117 D.P.R. 35 (1986), it held that requiring an employee to submit to a polygraph test violated the employee's constitutional rights to privacy, personal integrity and dignity. The court further expressed that Law 80 does not operate to deprive the worker of adequate remedies for effectively vindicating his or her constitutional rights and that Arroyo was entitled to seek both equitable and monetary relief from his employer for the constitutional violation. *Arroyo,* 117 D.P.R. at 65–66; *Segarra Hernandez v. Royal Bank de Puerto Rico,* 145 D.P.R. 178, 194 (1998) (although plaintiff's claim did not rise to constitutional level the court reiterated the exception to Law 80's exclusive remedy in cases where employer infringed employee's constitutional rights.)

■ Although fundamental, the right to privacy is not absolute and may yield to compelling circumstances. In an employment scenario, the validity of intrusions into an employee's privacy rights will be examined by reference to the employer's particular business interests at stake. That is, the individual's right to privacy will be balanced against the legitimate business interests that his or her employer is seeking to protect through the measures under attack. *Congreso de Uniones Industriales de Puerto Rico v. Bacardi Corp.,* 961 F.Supp. 338, 342 (D.P.R.1997) (*citing Arroyo,* 117 D.P.R. at 35)

■ For example, the right to privacy is infringed when limitations are placed on an individual's ability to make personal, family, or private decisions; when a couple's private life is publicly exposed in order to obtain a divorce; or when limitations are placed on the ability to decide whether to use contraceptives. *Segarra Hernandez,* 145 D.P.R. at 202 (internal citations omitted). In addition, the right of privacy and the right to be protected against abusive attacks to one's honor and personal reputation are injured when the tranquility of the home is shattered, when a person is harassed through the telephone system, or when the constant presence of a photo in the media constitutes an undue invasion of the family life. *Id.* (Internal citations omitted). To prevail in a cause of action for a constitutional violation in this context, "the plaintiff must present evidence of the employer's **concrete** actions that impinge upon the plaintiff's private or family life." *Segarra Hernandez,* 145 D.P.R. at 203. (Emphasis added) In *Segarra Hernandez,* the constitutional claim amounted to a charge of harassment based on a series of internal transfers and memoranda that the employee deemed offensive. After reviewing the evidence, the Puerto Rico Supreme Court did not recognize a cognizable constitutional claim. It held that the plaintiff's treatment did not rise to the level of a constitutional violation because it did not involve the "indiscriminate dissemination of private or personal information," did not "unreasonably impinge[ ] on her personal or family tranquility," did not "disseminate false or slanderous information," "or limit Segarra Hernandez's ability to make decisions about her private or family life."

■ Here, Ms. Rivera–Rosa alleges that her privacy rights were violated because she was asked about her personal and family life during Citibank's investigation and because the "methods and processes selected for her dismissal violated her integrity and dignity." (Docket No.

56, p. 17) In her own words, the process leading to her termination was "dehumanizing", "humiliating", "persecutory" [sic] and "subjective". For example, she alleges that she "was kept for approximate [sic] three hours in a room and ultimately pressured into preparing a handwritten statement before leaving the bank premises" while Mr. McCrossan walked "in circles around her", "was treated like a criminal suspect", and was not notified in advanced of the investigation.[10]

The uncontested facts in this case show, however, that there were no demeaning comments made towards her; that foul language was not used by Mr. McCrossan during the interview; that the Bank required the statement to be done that same day because a general strike had been announced in Puerto Rico for the following day; that Ms. Rivera–Rosa gave the statement voluntarily and that the pressure she felt was because of the time constraints she had to prepare the statement; that the statement was her version of the facts and did not contain anything false or incorrect; and that she never requested that the interview be stopped. Simply stated, the record is devoid of a single instance that may be considered as an "insult or humiliation" or that might be considered as a violation of Ms. Rivera–Rosa's constitutional rights.

Although Ms. Rivera–Rosa might have felt uncomfortable and tense during the interview, "[a] mere feeling of uneasiness in the workplace due to some labor-management situation does not constitute a violation of the right of privacy by the employer." *Segarra*, 145 D.P.R. at 207. Accordingly, plaintiff's constitutional claim must be **DISMISSED WITH PREJUDICE.**

---

**10.** Ms. Rivera–Rosa also claims (without providing a single piece of evidence) that the alleged fact that her dismissal is intertwined

## III. CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART AND DENIES** in part Citibank's Motion for Summary Judgment. (Docket No. 48) Ms. Rivera–Rosa's claim under Law 80 is **GRANTED.** In accordance with the stipulation filed by the parties, Ms. Rivera–Rosa is entitled to receive a severance pay or "mesada" of $76,061.53. Plaintiff's claim pursuant to the Constitution of the Commonwealth of Puerto Rico is **DISMISSED WITH PREJUDICE.** Judgment shall enter accordingly.

**IT IS SO ORDERED.**

with a parallel criminal investigation of CEDECO shows how her dignity in the workplace was harassed.